148          NEW YORK PRACTICE REPORTS.

First Nat. Bank of Lyons agt. Ocean Nat. Bank of N. Y. City.

# NEW YORK COMMON PLEAS.

FIRST NATIONAL BANK OF LYONS, respondents, agt. OCEAN NATIONAL BANK OF THE CITY OF NEW YORK, appellants.

*Bailment — for benefit of both parties — liability of bailee for loss.*

Bailments are divisible into three kinds: 1st. Those in which the trust is for the benefit of the bailor. 2d. Those in which the trust is for the benefit of the bailee; and 3d. Those in which the trust is for the benefit of both parties.

Where the defendants — a bank, located in the city of New York — by their circulars, sent to many of the banks in the western states, solicited their accounts, and, amongst others, the account of the plaintiffs — a bank, located in the state of Iowa — and as an inducement, offered to pass checks on certain places to its credit, upon the day of their receipt, and to buy and sell government bonds, gold and stock for the plaintiffs, without charge;

*Held*, 1st. That this come under the third subdivision of bailments above mentioned.

*Held*, 2d. That this arrangement having been gone into, in pursuance of such circular, it was obviously as an inducement to the plaintiffs to place its accounts with the defendants, that the offer was made to gratuitously pass checks to its credit, and buy and sell for it here, government bonds, gold and stocks; and there was necessarily implied in this proffered service a safe keeping of such bonds, &c., as they should buy whilst they remained with the bank, subject to the plaintiffs' order. It was an undertaking to exercise ordinary care, or that degree of diligence which men of common prudence exercise in respect to their ordinary affairs.

The defendants' bank was subsequently broken open and robbed, whereby the plaintiffs lost their property. It was claimed that the utmost engagement of the defendants was to use and appropriate for the safe keeping of plaintiffs' property such means, aids, appliances and agencies as they had when plaintiffs became their bailors, or as they might choose thereafter to require for their own benefit. That the plaintiffs accepted at their own risk what the defendants had to offer, and if it proved to be insecure, that the plaintiffs have no right to complain.

*Held*, 3d. That this is distinguishable from the class of cases to which such

First Nat. Bank of Lyons agt. Ocean Nat. Bank of N. Y. City.

a rule as this has been or ought to be applied. The plaintiffs had the right to suppose, from the circular, that the defendants used the ordinary means of institutions, undertaking so important a trust for the safe keeping of property of this description ; and that when advised of any danger from burglary and robbery, that it would make use of such precautions for the safety of what was intrusted to its care, as would be dictated by common prudence and the exercise of ordinary vigilance. Indeed, the strong feature in the case is, that there was reasonable ground for apprehension that an attempt would be made to rob the bank.

*Held*, 4th. That the question whether the defendants did exercise the care and diligence which was required of them from the nature of the bailments was a question which was not, under the circumstances, a question for the court but for the jury.

*Held*, 5th. That after a careful review of the whole testimony, the case having been submitted to the jury, under a charge, it must be regarded upon the whole, as favorable to the defendants, and it being a matter which was solely for them, the verdict should not be disturbed.

*General Term, July,* 1874.

APPEAL by defendants from a judgment at special term.

*Francis N. Bangs,* counsel for defendants, appellants.

*Lucien Birdseye,* counsel for plaintiffs, respondents.

DALY, *C. J.* — The defendants, by their circular, solicited the accounts of the plaintiffs' bank, and as an inducement offered to pass checks on certain places to its credit upon the day of their receipt, and to buy and sell government bonds, gold and stocks for the plaintiffs without charge. It is insisted by the appellants that this offer was so stated as to exclude the idea that the defendants gratuitously undertook the care and safe keeping of negotiable bonds; on the contrary, I think this was necessarily implied from the very nature of the offer. The plaintiffs were a bank doing business in the state of Iowa, and the defendants indirectly regarded it as an advantage to them in the carrying on of their banking business to have the account of this distant bank in Iowa at the rate of four per cent on its daily balances; the substance of

the circular was that they would be happy to have its accounts, and it was obviously as an inducement to the Bank of Lyons to place its accounts with them, that the offer was made to gratuitously pass checks to its credit, and buy and sell for it here government bonds, gold and stocks, and there was necessarily implied in this proffered service a safe keeping of such bonds, &c., as they should buy whilst they remained with the bank subject to the plaintiffs' order. It was an undertaking to exercise ordinary care or that degree of diligence which men of common prudence exercise in respect to their ordinary affairs (*Giblin* agt. *McMullen, L. R.* [2 *P. C. App.*], *pp.* 337, 338).

It is claimed that the safe keeping of such bonds as the defendants might buy for the plaintiffs formed no part of the business of a banking corporation, and that if undertaken by the cashier or other officer of a bank it was an individual undertaking on their part, being in no way connected with the purpose for which the corporation was created; that the authority which the defendants had was to exercise such incidental powers as should be necessary to carry on the business of banking, such as the discounting of paper, and the buying, loaning and issuing of notes, &c., and not by taking negotiable bonds for safe keeping, without reward, at the risk of the bank and of its stockholders. If there was nothing more than an offer on the part of the cashier, or other officers of the bank, to buy and sell bonds, &c., for the plaintiffs, there would be force in this reasoning, and I should have no hesitation in holding that, in such a case, the bank, as a corporation, would be under no obligation for the safe keeping of such securities. But it cannot be said that what was proposed in the printed circular, which the cashier sent the plaintiffs, and to nearly every western bank, was not in the business of banking. The receiving of deposits of money, and the paying of it out on the check or drafts of the depositors, forms a part, and a very considerable part of the business of banking. The eighth section of the act of congress of June 5, 1864,

enumerates, as among the incidental powers necessary to carry on the business of banking, "the discounting and negotiating of notes," &c., &c., and "the receiving of deposits" (*Laws of Thirty-eighth Congress, p.* 106). By having a large number of small deposits the possession of a considerable amount of money is insured to a bank at all times, by which it is enabled to add to its discounts and thereby increase its gains. The inducement to the depositor is the convenience of having a safe place where he can put his money as he receives it, and from whence he can draw it as he wants it; and the inducement to the bank to keep such accounts, and render this service to the depositor gratuitously, is the advantage above stated, that it enables it to enlarge its discounts. This being a legitimate branch of its business, it is entirely within the scope of such a business that a bank should offer other and additional inducements to secure the deposits of institutions as well as of individuals, and this was what was done in this case. The cashier sent, as he testified, to nearly every western bank a printed circular, prepared and signed by him, stating that the defendants, The Ocean National Bank, solicited the account of the bank addressed, upon the terms above stated, and setting forth, as already recited, what they did for the banks whose accounts they had. Letters were also read, sent by the assistant cashier to the cashier of the plaintiffs, in acknowledgment of inclosures received from them of bonds, coupons, coin, &c., which letters are headed with the names of the president, the cashier and the assistant cashier, with the title of their respective offices beneath their names, and containing over the name of The Ocean National Bank of the City of New York, the words "Designated Depository and Financial Agent of the U. S.," in the foot of which letters the assistant cashier writes to the plaintiffs' cashier as follows: "We shall use our best efforts to prove to you the strength of our circular, and to make our correspondence an agreeable one." All of which shows that what was proposed was proposed by the bank through its ordinary officers, and that what-

ever benefit or advantage was derived from its acceptance was derived by the bank alone.

Under these circumstances it is by no means clear to my mind that what was implied in this general offer, the custody and safe keeping for their correspondents of such bonds, &c., as they should buy for them, whilst they remained in their hands subject to the correspondent's order, was in strictness a gratuitous bailment.

Bailments are divisible into three kinds: 1st. Those in which the trust is for the benefit of the bailor. 2d. Those in which the trust is for the benefit of the bailee. 3d. Those in which the trust is for the benefit of both parties (*Story on Bailments*, § 3), and this appears to me to come under the third subdivision. It is a case in which the defendants, by a general circular addressed to a number of banking institutions, offer to do certain things in this city for the institution addressed, if it will keep its account with the defendants, that is, keep its deposits in this city with them. This is something more than a mere naked or one-sided bailment. It is an arrangement for the benefit of both parties. It is an offer made by the defendants, and not a request proceeding from the plaintiffs. A bailment, it is true, may be gratuitous, where the offer is made in the first instance by the bailor, but that is when it is understood by both parties that the service is to be performed without any recompense. But here the offer was conditional. It was an offer to do something for the advantage of the institution addressed, if it would do something else which was for the defendants' advantage, whereas a gratuitous bailment is one where the benefit is all on one side. It was a request to deposit all the available funds which the western institution might have in the city of New York with the defendants, at a low interest upon average balances, that the defendants, by having constantly a large amount on deposit, might increase its loans or discounts at the legal rate of interest. In other words, that they might get seven per

cent for the use of that for which they were to pay but four per cent.

It was a plain business transaction, by which they expected to be benefited quite as much as the institution to which they applied, for it may fairly be assumed that they would not have sent circulars containing this offer to nearly every bank in the western states, if they did not expect some benefit or advantage from the acceptance of it. It was evidently a scheme by which they expected to, and by which they probably did, largely increase the amount of their deposits, and is to be regarded as a business undertaking in which, for what they undertook or agreed to do, they expected to be amply recompensed or compensated by what they required their correspondents to do. What was agreed to be done on one side was incident to what was expected to be done upon the other, and the whole is to be taken together. The crediting of checks on Boston, &c., and the buying and selling here, of bonds, coin and stock for the bank to which the offer was made, being undertaken from the benefit to be derived from having the available funds of that bank in this city deposited with the defendants.

It was not, in my judgment, a gratuitous bailment of that description which would justify the rule that has been laid down in some of the adjudged cases, which exempts the bailee, from the gratuitous nature of the bailment, in the event of loss, unless it was occasioned by gross negligence or willful neglect equivalent in its nature to a breach of faith, or in practice equal to a fraud (*Foster* agt. *Essex Bank*, 17 *Miss.*, 479; *Tompkins* agt. *Saltmarsh*, 14 *Serg. & Rawle*, 275; *Whitney* agt. *Lee*, 8 *Metcalf*, 91). It was an undertaking which, as I have already said, imposed the exercise of ordinary care, or that diligence which men of common prudence exercise in respect to their own affairs. This was the rule laid down by lord Chelmsford, in *Gibbons* agt. *McMullen* (*supra*), where the plaintiff, who had opened an account with the bank, deposited in the bank a box containing securities, of

First Nat. Bank of Lyons agt. Ocean Nat. Bank of N. Y. City.

which he kept the key; which was not as strong a case as this, where the defendants undertook to do certain specific things if the plaintiffs would keep their account with them.

It is claimed that the utmost engagement of the defendants was to use and appropriate for the safe keeping of plaintiffs' property such means, aids, appliances and agencies as they had when plaintiffs became their bailors, or as they might choose thereafter to require for their own benefit. That the plaintiffs accepted, at their own risk, what the defendants had to offer, and if it proved to be insecure, that the plaintiffs have no right to complain. But this is distinguishable from the class of cases to which such a rule as this has been or ought to be applied. This was the acceptance, by a bank in a distant western state, of an offer made to it by a bank in this city, and receiving such an offer from an institution that had conspicuously printed upon its letters and correspondence " Designated Depository and Financial Agent of the U. S.," it had the right to suppose that it used the ordinary means of institutions undertaking so important a trust for the safe keeping of property of this description; and that when advised of any danger from burglary and robbery that it would make use of such precautions for the safety of what was intrusted to its care as would be dictated by common prudence, and the exercise of ordinary vigilance. Indeed, the strong feature in the case is, that there was reasonable ground for apprehension that an attempt would be made to rob the bank. And it is in view of this circumstance, of which the officers of the bank had repeated intimations and warnings, that the defendants' obligation, as the custodians of the large amount of money and securities, is to be considered. The question whether the defendants did exercise the care and diligence which was required of them from the nature of the bailments, was, in my opinion, a question which was not, under the circumstances, a question for the court but for the jury. If the test of ordinary care is that diligence which men of common prudence exercise in their own affairs, there is ordi-

narily no means of applying it except to leave it to the judg-
ment of a jury upon the circumstances of the particular case.
I do not mean to say that there may not be cases in which
the court can, as matter of law, say that this amount of care
was or was not exercised, but to say that, in the great bulk of
cases where that test is to be applied, the question ought to
be left to the determination of the jury. The twelve men
who sit in the jury-box are quite as competent to judge of
the diligence which men of common prudence exercise in
their own affairs as the men who sit in an appellate tribunal.
It implies that knowledge of character and of the manage-
ment of human affairs which is derived from observation and
experience; and there are generally men upon juries (at least
such has been my judicial experience) who have a more
thorough knowledge of, and practical acquaintance with, the
management of business than judges, and who are infinitely
better able to apply such a test than those who pass their lives
in acquiring a knowledge of the law, and in the administra-
tion of its rules and principles. In the present case it was
shown that the officers of the bank had been warned by the
police and others that there was reason to fear that an attempt
would be made to rob it; that this was not a vague or general
apprehension, but was founded upon a variety of circumstances
which produced such an impression upon the officers of the
police in that vicinity, and upon others, as to lead them to
communicate their fears to the officers of the bank, upon
whom, it would seem, these communications made little or
no impression; and the question in the case was whether, in
view of these repeated warnings, the officers of the institution
took such measures as common prudence would have dictated
for the preservation and security of their large amount of
property which they had in their charge. They were apprised
of the fact that in a previous year an attempt, or, at least, a
preparation for an attempt, had been made to enter the base-
ment of the bank building, which basement was then occupied
by an insurance company. This was indicated by the finding

of wax on the lock of the basement door, such as is used for taking the impression of key-holes, and that a month later the lock of the door was found to be broken, having been forced, and, as a witness expressed it, "burst by main strength and rendered valueless." And this circumstance induced vigilance on the part of the witness Holley, who was the surveyor of the insurance company. In connection with these facts he saw men loitering about the building whom he looked upon as thieves; of all of which circumstances he apprised the president, telling him that, in his opinion, these men were there for the purpose of robbery, and he cautioned the president against any attempt that might be made.

In the month of January following, five months before the robbery, Holley observed a man who came into the insurance office in the basement, under the pretense of examining the business directory; it was handed to him, he deliberately took off his overcoat and overshoes, and took a seat, looking at the directory. Holley suddenly turned his eyes toward him and found that he was not looking at the directory, but was casting his eyes about the office, and as the witness expresses it, "taking the lay or situation of affairs in the the basement;" upon which the secretary requested him to take his seat outside, where there was a desk and paper if he wished to make a memorandum, when the man left. Holley went the same day to the president and told him of this circumstance, upon which the president went down to the office in the basement, where the matter was talked over, and the president told Holley that prior to this circumstance, upon two occasions, persons were found during business hours in the bank; one inside the railing, by the wash-hand basin, and the other inside the railing of the bank itself; that one of the men who had been thus seen, jumped out of the water closet from the directors' room and out of the Fulton street window, upon the sidewalk; and it was shown by the testimony of the porter of the bank, immediately after this man jumped out of the window a jimmy was found upon the floor of the

directors' room. This circumstance was known to the president, the cashier, the receiving teller and to one of the directors. These facts, as I have said, induced great vigilance on the part of Holley, and he made it a rule afterward to go to the office in the basement two or three times a week during the night, and upon every Sunday and holiday, scarcely leaving the office alone for six hours at a time after his suspicions were aroused. He told the president of the bank, upon several occasions, that he deemed it highly important to guard against the robbery of the bank, and that he (the president) ought by all means to have a watchman to guard the bank after it was closed at night. Again, that he ought to take extra precaution to guard the bank, telling him what he (Holley) had done in respect to lighting the basement, and expressed to him the opinion that he had better do the same; precautions which the defendants afterward adopted, it appearing that after the robbery they had the bank lighted at night, and kept a watchman there. Holley also called the president's attention to the robbery of the New York Exchange Bank, of the burglars digging under the foundation of two buildings, and, of the North River Bank, and through the side of that bank and up into the vault which contained the deposits or the New York Exchange Bank. He told the president many times (he thought about twenty times) that there should be a private watchman in the bank, and when the insurance company moved out of the basement in February, 1869, four months before the robbery, Holley said to the president, "that now that the watch-dog of the institution was gone he (the president) would now have to look out for the Ocean Bank himself;" to which the president replied that he thought he could do so, or something to that effect; that he thought he could take care of the bank himself, that he could get on very well and was not afraid of any robbery.

Holley further testified that upon almost every occasion when he talked to the president and inculcated the idea of his having an extra watchman, that the president would say it was too

expensive, that the vaults of the bank were too strong for burglars ever to approach them; that they could not get into them, and that it was nonsense and foolishness to apprehend any danger; that he did not apprehend it himself; the best commentary upon which is what he said to Holley after the robbery : " For God's sake and mine, never make any mention of any conversation that has passed between you and me in relation to the robbery of this bank." This witness is characterized by the counsel for the appellants as a " professional alarmist," but it is, in my opinion, impossible to read the testimony in the case without the impression that if his advice had been followed the event that has given rise to this suit would have been avoided. But Holley was not alone; the porter of the bank called the attention of the president to men who were watching the bank from the street; he showed the jimmy to the president, advised the keeping of a night watchman, and a few days before the robbery called the president's attention to the fact that the windows of the basement were closed, as a strange thing, and received for reply that the people who had leased the basement were to look after that. The suspicions of the police were aroused as early as the fore part of 1869. A police detective received information which he communicated to the sergeant of police of that precinct, and the captain received orders to watch the bank in February and March, and this watching was continued until within a few weeks of the robbery. Another sergeant had his attention specially turned to the bank three or four months before the robbery, having heard that a raid was to be made upon it. Several policemen saw, watched and arrested improper characters about the bank, parties whom they knew to be thieves. One especially celebrated character and his pals were seen by one of the sergeants loitering about the bank, with no apparent business or ostensible purpose, as thieves generally do, taking a sort of measurement of the building, passing, crossing, lingering or loitering about there until within thirty days of the day of the robbery. Sergeant Phillips within a

month before the robbery, received information that the bank was going to be robbed on a certain Sunday night, and had it watched that night until midnight. A noted criminal, who had the character of preparing and making up burglarious burglaries, was seen around the bank by the police, and other suspicious characters were seen by the officers—persons who go up and stand in the hallway and who come back without going in. Suspicious characters being noticed by the police, especially on Sundays, all of which was observed until about two weeks before the robbery when there was a lull, the burglars being then in all probability in possession of the basement and consummating the plans by which they reached the bank and its vault through the basement. The acts of the janitor attracted the attention of the police, such as his lounging about the bank; talking to women, white and black; lolling on the rail in a careless position that aroused the suspicion of the policemen, and in some instances it is sworn that he was intoxicated. In view of these circumstances sergeant Phillips made three visits to the bank, having two interviews with the cashier and one with the president. He informed the president that he did not consider the bank in a secure condition, that it was not properly watched and guarded, and that he had seen suspicious characters about whom he knew to be thieves; that one of them was the noted criminal already referred to, Dutch Heinrich, the notorious bank robber; that reports also were made to him (the sergeant) by detectives that they had seen suspicious characters around the bank, that it was a matter of great anxiety to the police, and that if a change was not made he would not be surprised to hear of the bank being robbed at any time; that he asked the president to make a change, recommended to him a safe and honorable man named Doughty, told him that the colored janitor was not of any use at all there; that he was no protection, that he was about the streets and drank too much; that the witness thought the janitor was intoxicated; that he had better have a good man in his place if he

wanted the bank taken care of, and it would relieve the anxiety of the police very much. All this took place thirty or sixty days before the robbery, but it produced no effect. The cashier declined to give any answer and referred the matter to the president, upon whom the representation and warnings of the sergeant, it would seem, produced as little effect as the advice and warnings of Holley. The president's reliability upon the impregnability of the vault and safes were shown not only by the result to have been unfounded, but there was evidence which I shall not recapitulate in detail showing that his attention was called by experts to the importance of a safe with repads and steps to prevent wedging, and to the occurrence of robberies by the use of wedges. For six months before the robbery the outer door of the safe was closed with difficulty in consequence of lining it with steel, by which its weight was greatly increased, causing it to sag, whereas the expert by whom this change was made advised a different course, telling the president that the door-frame should be taken out and a new one put in, to which the door should fit, a suggestion of some importance, as it was at least a question upon the evidence whether the outer door was not in fact open on the night of the robbery, by means of which the burglars might have been enabled to get the key of the inner door, as the outer and second doors of the vault were found after the robbery to be entirely uninjured. It was a fair question, moreover, upon the evidence whether the janitor was a fit person to have intrusted with so important a charge, especially after the police sergeant told the president what the police officers and citizens had reported to him respecting the janitor's habits; that he was about the streets and drank too much, particularly as he was obtained from an intelligence office and came to the bank without any references or recommendation from his home or from New York.

There was also the circumstance that the basement, after the insurance company and their attaches had left it, was

leased in March or April, a comparatively short period before the robbery, by a verbal lease, to a man then under the suspicion of the police, and who was afterward sentenced to the state prison, without any provision or restriction against subletting. This man (O'Kell), in June, let the room which was under the president's room, to a man named Cole, receiving the rent in advance up to July first; and Cole was never seen afterward. It was from this room, and by means of it, that the entrance was effected through the ceiling into the bank, and the robbery successfully executed. The insurance company assigned their lease to Newcomb & O'Neil, and the president who knew Newcomb, assented to it. These tenants were unable to pay their rent, and Newcomb wanted to dispose of the lease, and saw the president. The proposition was to lease the basement to O'Kell, and the president reluctantly consented to inquire into O'Kell's reputation. He did so; and after taking two weeks was not satisfied; but Newcomb becoming impatient, the president concluded to let O'Kell have the basement; so that, in point of fact, it was leasing the basement verbally to a person, although the president had not satisfied himself respecting him, and without putting him under any restrictions as to subletting it; and whether this was, in view of all the circumstances, an exercise of care to be expected of a man of common prudence, was a fair question to submit, with the other suggestions, to a jury. Whatever was done or ought to have been done, in the proper care of property, by the officers of the bank, is to be regarded as the act or omission of the corporation itself (*Bissell* agt. *M. S. & N. J. Railroad Co.*, 22 *N. Y.*, 288). And the question to be passed upon was, whether, in view of the facts which had come to the knowledge of the officers of the bank and of the warnings they had received, it was a want of common prudence to lease the basement in the way in which they did; to dispense with such security as might be afforded by lighting up the bank and having a watchman there at night, and of having it visited regularly upon Sun-

days·and holidays ; in which was involved also the question whether a change ought to have been made in the janitor after the information communicated respecting him, and the opinion expressed by the police sergeant, who observed that he was not of any use at all, and afforded no kind of protection ; and whether measures should have been taken for the more effectual protection of the vault and of the. safes, after what was communicated by experts and others respecting both. These were all matters for the consideration of the jury, which acquired an importance that perhaps might not otherwise have attached to them from the fact that the officers of the bank, who were forewarned by significant circumstances and by the opinions of experienced persons of the impending danger, the bank was left from Saturday afternoon until Monday morning, during which time the robbery was perpetrated, were safeguards which, in the judgment of persons of experience, were necessary, which might have prevented the robbery, and· which, after the robbery, were adopted by the bank for its future protection.

The appellants argue that the robbery was effected by great cunning and patience, coupled with extraordinary audacity and resolution, combined with perfect mechanical skill, perfected in such a way as not to arouse suspicion, and yet, with ample preparation to overcome resistance ; and they liken it to a great conflagration, extraordinary, unexpected, and probably beyond the reach of very high and extensive exertion of diligence. Not having a light in the bank and the keeping of a watchman there at night was not a very high nor a very extensive exertion of diligence, in view of the fact that the bank had over two millions in money and securities in its vault. · To nearly all who concerned themselves about the matter, except the president, the adoption of these additional means of security were thought necessary in view of what had occurred and been observed, and were strongly urged; but he, as it would seem, with a blind fatuity, treated all such suggestions as nonsense and foolishness. The appel-

NEW YORK PRACTICE REPORTS. 163

First Nat. Bank of Lyons agt. Ocean Nat. Bank of N. Y. City.

lants argue that he relied upon the ample police force, the remoteness and strength of the vault, the heighth of the windows above, and the fact that the building fronted upon two streets, honestly deeming these sufficient. But he was informed of the great anxiety of the police for the safety of the bank, and was unwilling, or did not aid on his part, by doing what they pointed out to him as additional and necessary measures to protect it from robbery. It was, as I have said, left, under all these circumstances, from Saturday until Monday, under the care of the janitor, whom the president had been urged to remove, and who says he visited the bank upon Sunday, and went close to the vault without seeing anything to create suspicion, but whose statement the jury might very well, and probably did, discredit, as the various accounts which he gave of his visit did not agree with each other as respects the time or the circumstances. The case was submitted to the jury under a charge, it must be regarded upon the whole as favorable to the defendants; and it being a matter, in my judgment, which was solely for them, the verdict should not be disturbed.

I shall pass over the labored commentary of the appellants upon the judge's charge, and numerous exceptions taken to parts of it, without considering either in detail, as it would involve a repetition of the views already expressed. As a general observation, I am of the opinion that the defendants are not entitled to a new trial for any of the refusals of the requests to charge, or upon the exceptions taken to parts of the charge upon the ground as misdirection. Many of the exceptions may be regarded as coming under the exception taken to the general construction that the diligence required was proportionate to the danger of the loss, and that the great value of the property was an important element in fixing the liability for the loss, under which is included what was said about a country village where robberies are uncommon, and a populous city where crimes are frequent. As respects this general instruction and all that was said or excepted to under

it, I have already sufficiently indicated my opinion. The defendants were not entitled to the positive instruction that if they took as much care of plaintiffs' property as they did of their own they were exempt from liability. It was, undoubtedly, a circumstance for consideration; but if the defendants claim to exercise the care of the plaintiffs' property which was required of them, it would be no defense that they did the same with respect to their own (*Dorman* agt. *Jenkins*, 2 *Adolph. & Ellis*, 256; 6 *Rob. A. P. M.*, 216; *Gibmon* agt. *McMullen, supra*). It was not an error for the court to refuse to charge that the burden was on the plaintiffs of proving gross negligence on the part of the defendants; and the same remark applies to the requests made and to the exceptions to the instructions given, which requests and exceptions were based upon the assumption of the appellants that all that was shown to establish the cause of action was, at the furthest, merely an error of judgment on the part of the defendants, and not the omission of any duty which they owed the plaintiffs. Of the numerous exceptions taken to evidence submitted by the plaintiffs, I have this general observation to make: That, in my opinion, the evidence objected to was admissible upon the general question whether there was or was not, under all the circumstances, a want of common prudence on the part of the officers of the bank. If there is any doubt it is limited to the proof of what the president said to Holley on the day after the robbery; but, after full consideration, I think this was admissible as to proof of an attempt on the part of an officer of the bank, whilst he was still acting as its president, to suppress important evidence bearing upon the question of the liability of the bank. Corporations are responsible for the wrongful acts and for the declarations and admissions of their officers, in their official capacity, in the management of the affairs and transactions of the business of the corporations done in the course and within the scope of its business (*Angell & Ames on Corporations, secs.* 310, 659). They do not differ, in this respect,

from natural persons ; and if an individual, immediately after the loss of property intrusted to his care, should improperly attempt to suppress evidence tending to establish his negligence, I think the fact must be shown ; and if it is admissible upon the question of the existence or absence of negligence in the case of an individual, I do not see why it is not equally applicable in the case of a corporation. The president was acting for the bank and its interests, and with the knowledge of the intimation and warnings which the officers of the bank had previously received, and confronted by the fact that what was apprehended by the police and by Holley, the robbery of the bank had been accomplished, and more than $500,000 of money and securities stolen. His attempt to induce Holley to keep silent was a very significant circumstance as an effort to save the bank and himself from liability for the consequence. It was an act in his own interest, and for that of the institution of which he was the chief officer ; and occurring, as it did, immediately upon the happening of the robbery, I think the court was right in allowing it to be proved. The evidence offered, as the defendants claim, to repel the presumption which might arise from their leaving Holley's evidence uncontradicted by the president was not admissible. It was shown by the secretary's evidence that the president had gone to South America, and was there at the time of the trial. They had the benefit of this, and were not entitled to show when the receiver of the defendants first knew that the plaintiff claimed that Holley had given the information to the president which Holley swore to when the receiver tried to postpone the trial until Martin returned.

Judgment should be affirmed.

ROBINSON and J. F. DALY, JJ., concur.