# ELISHA GRAY ET AL.

## v.

# WILLARD D. MERRIAM.

*Bailments—Banks—Bonds of Customer.*

1. It can not be said that a banker is without compensation who holds income-bearing bonds for a customer, and collects the income and deposits it with himself to the credit of his customer's general account.

2. No rule of law exists which makes the quantum of consideration a

determinative feature of what the relation of a bailee is. It is enough if there is any consideration for the bailment, to change the relation from that of a gratuitous bailee to one for hire.

3. Where bonds are left by a customer with a bank, part of the time for purposes of collateral security, and at other times for safe keeping, but with duties assumed and performed by the bailee in detaching and collecting coupons for the bailor, and an attendant or incidental reward for the performance of such duties, such bailment is for the mutual benefit of both parties, and in such a case the bailee is bound to exercise a greater degree of care than if the bailment were one in which the bailee would be liable only for gross negligence.

4. In the case presented, this court holds, in view of the evidence as to the manner in which the bonds in question were kept by defendant bank, and as to the continued access thereto by the servant who subsequently stole them, after his employers became aware of his speculating upon the board of trade, that they were guilty of gross negligence and that the judgment against them can not be disturbed.

5. Whether in such case there was a want of due and ordinary care in the custody of such property, and whether the degree of diligence required by law was exercised, are questions of fact for the determination of the jury. In determining what constitutes proper care, the nature and value of the property, the means of protection possessed by the bailee, and the relation of the parties, must be considered.

6. The fact that such servant was permitted to continue in the access to the funds and securities of the firm, as well as to the special deposits, after it was known that he was so speculating, will not excuse such firm in case of the abstraction of the securities.

7. In such case, after the discovery of the practice of such servant, if he is retained it is incumbent upon the employers to decline longer custody of the bonds, or to add increased protection to them.

8. The rule that if the depositary takes the same care of the deposit that he does of his own goods it will repel the presumption of gross negligence, must be under the reserve that he has not omitted those common precautions which other persons in like position would not omit.

9. It is no excuse for a depositary that he has acted with good faith if he has been guilty of gross negligence; the question is not to be determined by what a particular person has done or would do as an individual, but it is what a whole class of persons in like condition with reference to the deposit, would do.

[Opinion filed November 11, 1892.]

IN ERROR to the Circuit Court of Cook County; the Hon. FRANK BAKER, Judge, presiding.

Messrs. HOYNE, FOLLANSBEE & O'CONNOR, for plaintiff in error Elisha Gray.

Messrs. Robert Hervey and C. Stuart Beattie, for defendant in error.

Mr. Justice Shepard. This is a suit brought by the defendant in error, Willard D. Merriam, against Elisha Gray, the plaintiff in error, and Samuel A. Kean, the surviving partners of the firm of Preston, Kean & Co., to recover the value of fifteen United States four per cent. bonds, for $1,000 each, claimed to have been left with said firm for safe keeping, and lost through the negligence of said firm.

The firm of Preston, Kean & Co. was engaged in the general banking business in Chicago, and Merriam, the defendant in error, had for several years prior to 1879 kept a running deposit and check account with them, and had at times borrowed money of them.

In February, 1879, Merriam purchased twelve of the lost bonds from, or through the agency of, the firm, and took them to his home in Iowa, and in the spring of the same year purchased in a like manner three other like bonds, which he directed the firm to keep for him.

In June of the same year he borrowed of the firm, $15,000, and sent them the twelve bonds he had at home to hold as collateral security, together with the other three bonds they already held for him.

Whatever, if any, other transactions by way of loans or renewals may have occurred between the firm and Merriam after that time, and before March, 1881, seem to have been settled, for on March 19 and 24, 1881, the firm wrote Merriam, sending him his canceled notes, and advising him that they "hold in special deposit subject to your order fifteen one thousand dollar United States four per cent bonds—say $15,000."

It does not appear that Merriam ever had all or any one of said bonds in his actual possession, or that he ever in fact saw them or either of them, after that time.

He did, however, after that time, borrow small sums of the firm—twice $500 and once $600—and a part or all of said

bonds were, by the terms of the notes given by him for the
money so borrowed, pledged to the firm as collateral secu-
rity.

The record contains a copy of one of the notes for $500,
wherein it is recited that Merriam has "deposited with them
as collateral, United States bonds," and it may be presumed
from the evidence that the same or words of like import
were used in the other notes. The effect of such general
language would operate as a pledge of all the United States
bonds belonging to Merriam in the possession of Preston,
Kean & Co., if they chose to so treat them, and the presump-
tion is that the latter treated the whole fifteen bonds as col-
lateral to said notes. The three notes last referred to appear
to have been made and paid in 1881, and subsequent to
March of that year, and it does not appear that at any time
subsequent to the year 1881 Merriam was indebted to the
firm for borrowed money, or otherwise.

The bonds were stolen by Frederick M. Ker, in 1882,
while Ker was acting as assistant cashier or assistant man-
ager of the firm in its banking business.

During the time they were held as a special deposit, the
bonds were tied together and kept in one of the safes in the
vault of the bank—the same safe in which the cash of the
bank was kept, but in a separate compartment of the safe—
and Ker, Mr. Kean, the managing partner, and Mr. Ware,
the cashier, were the only persons who had access to the
safe.

The quarterly coupons, for interest on the bonds, as they
matured were detached and collected by the firm, so long
as the bonds remained in their possession, and the amount
was credited to the general deposit account of Merriam
with them, and was either remitted to him at his request in
New York exchange, or lay subject to his check in the reg-
ular course of the firm's banking business. Merriam was
also, in fact, credited with, and paid by, the firm, the inter-
est which matured on the bonds on January 1, 1883, a date
subsequent to the time when they were taken by Ker.

Ker testified that he credited Merriam's account in

advance with the amount of the coupons maturing on January 1, 1883, knowing at the time that the bonds were not on hand, so as to anticipate any demand that Merriam might make for the coupons.

With reference to the coupons which matured October 1, 1882, at which time, according to the testimony of Ker, it is uncertain whether the bonds were on hand or not, the firm wrote Merriam on October 6, 1882 : " Yours received. We credit $150—coupons.   The bonds give us no trouble at all.   Glad to be of service to you."

Ker had been in the employ of the firm for many years, and had risen by regular gradations to the responsible position of assistant cashier, assumed by him in November, 1881.   Very shortly afterward, and in December, 1881, or January, 1882, rumors that Ker was speculating on the board of trade reached Mr. Kean, the active managing partner of the firm, and he spoke with Ker about it.   Ker admitted he had been speculating some, but claimed that as he was operating with his own money, it was not an objectionable practice.

There is some contradiction between the testimony of Kean and that of Ker as to the number of conversations had between them on the subject of Ker's speculations, and as to what was said, but we fail to find in the testimony of either one, any forbidding, by Kean, of further speculation by Ker.   The nearest approach to it is in the testimony of Kean that he asked Ker if he didn't know it was against the rule, but he fails to state that he made any reply after Ker said he would stop if it was against the wishes of the firm.

The issue of fact for the jury was, were the defendants below guilty of such negligence in the care of the plaintiff's bonds as to make them liable for their value?   The degree of care required depended upon the nature of the possession of the plaintiffs in error.

It is strongly contended that the possession of the bonds by the firm was merely that of a gratuitous bailee, and therefore they are not liable for the loss; that the bonds

were held as a special deposit merely, without compensation, and that no liability would attach except in the event of their loss having been the result of gross negligence.

The business of the firm of Preston, Kean & Co., was that of general banking, buying and selling exchange, bonds, etc. Merriam was one of their regular customers, keeping an ordinary deposit and check account with them, borrowing money of them and buying bonds of them. The bonds in question were at times held by the firm as collateral security to loans made to Merriam, and at other times were kept as a special deposit, subject to be taken away by him.

At the time they were stolen by Ker, they were not held by the firm as security, but were subject to Merriam's call. During all the time the bonds were in their possession, the firm cut off and collected the interest coupons, giving Merriam credit for the amount in his general account, and in that way received a pecuniary benefit to the extent that a deposit of money in their bank was a benefit to them. One of the chief sources of profit derived by bankers is through their deposits.

Can it be said that a banker is without compensation who holds income-bearing bonds for his customers, and collects the income and deposits it with himself to the credit of his customers' general account?

The profit in the case under consideration may have been slight, but we know of no rule that makes the quantum of consideration a determinative feature of what the relation of the bailee is. It is enough if there is any consideration for the bailment to change the relation from that of a gratuitous bailee to one for hire.

At least on one occasion the interest collected was remitted to Merriam in New York exchange. It is a matter of general knowledge, that interest on government bonds is payable in either one of several cities where sub-treasuries are located. The firm, therefore, as holder of the coupons, had the advantage of exchange afforded by them. It is well understood that dealing in exchange is a considerable source of profit to bankers. Furthermore, these bonds

were deposited by a customer of the banking firm; they were there because Merriam was a customer and it is fair to presume would not have remained there if he had ceased to be a customer, and as a customer he was a source of profit to the banking firm. It would seem, therefore, that the bailment of the bonds in question, part of the time for purposes of collateral security, and at other times for safe keeping merely, but with duties assumed and performed by the bailee in detaching and collecting the coupons for the bailor, and an attendant, or incidental reward for the performance of such duties, was for the mutual benefit of both parties, and in such a case the bailee is bound to exercise a greater degree of care than if the bailment were one in which the bailee would be liable only for gross negligence.

But in addition to the circumstances under which the bonds were left with and held by the firm, the manner in which they were kept is a proper subject of consideration in determining the liability of the firm as bailees.

Whether there was a want of due and ordinary care in their custody, and whether the degree of diligence required by law was exercised, are questions of fact that were for the jury to determine, and unless they were clearly wrong in their verdict, it should not be disturbed. Third National Bank v. Boyd, 44 Md. 47.

In determining what constitutes proper care, the nature and value of the property, the means of protection possessed by the bailee, the relation of the parties, and other circumstances, must be considered. Here was a large amount of the best securities known to financial circles, negotiable by mere delivery, tied together in a package open for inspection, placed loosely in a safe to which three persons had free access. One of those persons, Ker, was known by the managing partner of the firm to be a speculator on the board of trade. The hazardous character of such operations and the liability and temptation it affords to persons holding trust funds to violate their trust, is well understood; and that the firm knew it was hazardous, and full of illicit temptation, appears in evidence from the conversations between Kean and

Ker. And yet, after such knowledge came to Mr. Kean, he allowed Ker the same access to the safe and all its valuable contents, as he had enjoyed before. The bonds were safe when the firm first knew of Ker being a speculator, and if he had been promptly deprived of his position of trust, the loss would have been averted. Permitting him to continue his theretofore customary access to the valuables intrusted to their care, was not only a want of due and ordinary care on the part of the firm, but in our opinion was gross negligence. The amount and value of the bonds were known; they had been handled and held as collateral security by the firm, more than once; and at one time for a loan equal to their face value; they were kept in a package open to examination, and that was, during the two or three years of their deposit, in fact opened periodically for cutting off and collecting the coupons. These facts were all before the jury and it was their province to decide whether thereunder the requisite degree of diligence had been observed by the firm. First National Bank v. Ocean National Bank, 48 How. Pr. Rep. 148.

It is no sufficient answer that Ker was permitted to continue in his access to the funds and securities of the firm, as well as to the special deposits, after it was known that he was a board of trade speculator, and that therefore the firm had exercised the same decree of care over the special deposits belonging to their customers that they had over their own property of a like kind.

The facts disclosed by the record hardly warrant the conclusion that the same degree of care was exercised by the firm over their special deposits as over their own securities, except in so far as they were kept in the same safe, and were accessible to none but the same persons. A system of checking off and examining their own securities at frequent intervals appears to have prevailed, which did not apply to special deposits. We do not hold that the absence of such a system applied to special deposits, however admirable it might be, would constitute a lack of reasonable diligence by the depositary, but merely refer to the evidence

on that subject as showing a lack of support to the contention that the same degree of diligence against an unauthorized abstraction of special deposits existed, as in the case of the firm's own securities.

From the character of the business in which the firm was engaged and the relation of banker and customer existing between the parties, Merriam was justified in reposing confidence in them and in assuming that none but persons of integrity would be permitted to have disposal of his bonds. After reasonable grounds of suspicion of the faithfulness of Ker had arisen, the degree of diligence imposed upon the firm in relation to the bonds immediately enhanced, and it became their duty to promptly decline a longer custody of the bonds, or else to add increased protection. Neither was done in this case. Ker was permitted the same access to, and handling of, the bonds as theretofore, and Merriam was not notified, and the bonds were in fact afterward abstracted by Ker.

We can not think that the mere fact that Ker was also permitted access to, and handling of, the cash and securities which were the property of the firm, after the circumstances of suspicion against him had become known, constitutes a justification of the firm in relation to Merriam's bonds. It was undoubtedly a circumstance for consideration, and one that the jury had before them. First Nat. Bank v. Ocean Nat. Bank, *supra;* Dorman v. Jenkins, 2 Adolph. & Ellis, 256.

The rule that if the depositary takes the same care of the deposit that he does of his own goods it will repel the presumption of gross negligence, must be under the reserve that he has not omitted those common precautions which other persons in like position would not omit. Story on Bailments, Sec. 97.

It is no defense to a depositary, that he has acted with good faith, if, in truth, he has been guilty of gross negligence. Ibid., Sec. 66.

Considered abstractly, the question is not to be determined by what a particular person has done, or would do, as an individual, but it is what would a whole class of per-

sons, in like condition with reference to the deposit, do. Ibid., Sec. 64; Third Nat. Bank v. Boyd, 44 Md. *supra.* In other words, the care required was such as a reasonable man, similarly situated with reference to the deposit, would ordinarily take of his own. Ibid., Sec. 64 a.

It is, we think, obvious, that the court in its first instruction to the jury in behalf of the plaintiff below, erroneously defined the term " gross negligence," as being the want of ordinary and reasonable care; but we do not see how, in view of the entire instruction, the jury could have been misled by it. The absoluteness of the instruction in other respects is not qualified by the definition, and it is apparent from what we have said that the jury ought to have found, and probably did find, from the evidence, that the firm had been guilty of gross negligence.

We do not conceive that the error referred to produced the verdict upon which the judgment was rendered. Under the evidence the jury ought to have found as they did, and if the verdict had been otherwise, it should have been set aside.

That being so, the judgment should stand, and it is therefore affirmed.

*Judgment affirmed.*