# The Third National Bank of Baltimore vs. William A. Boyd.

*National Bank—Contract of Bailment—Power of a National Bank to receive on Deposit Bonds as Collateral security for the existing debts of a Customer, and for Future loans and discounts—Liability of a National Bank for the Loss of Bonds deposited for such purpose—Degree of Care and Diligence required of a Bank in the custody of Bonds deposited as Collateral security—Measure of Damages—Province of the Jury.*

The Third National Bank of Baltimore was organized under the National Currency Act of 1864, ch. 106. The firm of W. A. B & Co., of which W. A. B. was the senior member, was a large customer of the bank through which all the banking business of the firm was transacted, and from which it received accommodations as needed. On the 5th of February, 1866, the firm was indebted to the bank about $5000, and W. A. B. voluntarily proposed to the president of the bank to deposit with the bank about $37,000 in bonds, as collateral security for his present and future indebtedness. Subsequently as agreed between W. A. B. and the president of the bank, certain bonds and stocks were deposited as collateral security for the payment of all obligations of W. A. B. and W. A. B. & Co. to the bank, then existing, or that might be incurred thereafter, with the understanding that the right to sell such collaterals in satisfaction of such obligations, was vested in the officers of the bank. Some of the bonds were subsequently withdrawn and others deposited in their place. While these collaterals remained in the bank, the firm kept a deposit account with the bank, having an average amount of about $4000 on deposit, and from time to time as it needed, obtained discounts ranging from $2000 to $15,000, on the security of the collaterals; it sometimes owed the bank nothing, but left the bonds in its vault; at times when the firm wanted money for a very short time, it obtained it from the bank, on the security of these collaterals, on what were called "call loans," by checks. The officers of the bank considered the account of the firm a very desirable one, and the arrangement by which

every liability of theirs was secured by the collaterals, very advantageous to the bank.   The firm was not indebted to the bank subsequent to July, 1872, when it paid its last indebtedness; the bonds were not withdrawn, but left in the bank under the original agreement.    Between Saturday evening the 17th and Monday morning the 19th of August, 1872, the bank was entered by burglars and certain of the bonds were stolen.   By section 8 of the Act of Congress of 1864, ch. 106, a bank organized thereunder, is authorized "to exercise all such incidental powers as shall be necessary to carry on the business of banking, by discounting promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits, by buying and selling exchange, coin and bullion; by loaning money on personal security, and by obtaining, issuing and circulating notes according to the provisions of this Act."   In an action by W. A. B. against the bank, to recover the value of the bonds which were stolen, it was HELD:

1st. That the contract entered into by the bank was not a mere gratuitous bailment.

2nd. That the bank had the power to enter into the contract, it being within the terms of the Act of Congress.

3rd. That the original contract of bailment being valid and binding, the obligation of the bank for the safe custody of the deposit, did not cease when the plaintiff's debt had been paid.

4th. That the defendant was responsible if the bonds were stolen in consequence of its failure to exercise such care and diligence in their custody or keeping, as at the time, banks of common prudence in like situation and business, usually bestowed in the custody and keeping of similar property belonging to themselves; that the care and diligence ought to have been such as was properly adapted to the preservation and protection of the property, and should have been proportioned to the consequence likely to arise from any improvidence on the part of the defendant.

5th. That the proper measure of damages was the market value of the bonds at the time they were stolen.

Whether due care and diligence have been exercised by a bank in the custody of bonds deposited with it as collateral security, is a question of fact exclusively within the province of the jury to decide.

APPEAL from the Circuit Court for Howard County.

On the morning of Monday, the 19th of August, 1872, when the officers of The Third National Bank of Baltimore arrived at the bank, it was discovered that since the

close of business on Saturday evening, the vault and safe
of the bank had been broken into by burglars, and robbed of
a large amount of money and valuable securities.    The
entrance had been effected through the walls of an adjoin-
ing building, belonging to Mr. John S. Gittings, by
tenants of that building, who had rented it doubtless for
the express purpose of carrying out the scheme of plunder.
By appropriate and ingenious tools, the walls of both
buildings, and of the vault, and the iron plates between
the double walls of the vault had been perforated, and the
safe within forced open.    Among the valuables taken were
some $64,000 in money belonging to the bank; $10,000
in the custody of the paying teller; $40,000 of coupon
bonds belonging to the family of the acting president of
the bank and in his custody; and various coupon bonds
belonging to the appellee, the market value of which at
that time was nearly $26,000.    To recover the value of
these last mentioned bonds the present suit was instituted
by the appellee against the appellant in the Superior Court
of Baltimore City, whence it was removed, on the suggestion
and affidavit of the latter, to the Circuit Court for Howard
County, where it was tried.    There was much testimony
in relation to the circumstances attending the proceedings
of the burglars, and in regard to the precaution taken by
the appellant, and by other banks in the city of Baltimore,
to guard the money and other valuables in their custody.
On one side, the object was to show, that every thing was
done that could be reasonably required on the part of the
defendant for the safe-keeping of the bonds in its vault;
on the other, that there was such remissness in various
respects as rendered the defendant liable to the owners of
special deposits.

At the close of the testimony, the plaintiff offered seven
prayers, of which the Court granted the first, fourth, fifth,
sixth and seventh, and rejected the second and third.    The

first and seventh prayers are sufficiently set out in the opinion of this Court; the fourth, fifth and sixth are as follows:

4. That if the jury shall find that the bonds of the plaintiff were in the custody of the defendant under the agreement, and for the purposes set forth in the plaintiff's first prayer, and that the robbery and loss of the bonds thereby which have been given in evidence, might have been prevented by ordinary vigilance and care on the part of the watchmen of the bank, or either of them, then the loss of the plaintiff's bonds by said robbery is no defence to the plaintiff's claim in this action.

5. If the jury find that the bonds of the plaintiff being in the custody of the defendant under the agreement, and for the purpose set forth in the plaintiff's first prayer, were lost or stolen by reason of any neglect of or inattention to duty on the part of any of the officers or employés of the bank, which the jury shall find to amount to want of ordinary vigilance and care, the defendant is responsible therefor.

6. That the degree of care which the defendant was bound by law to take of the bonds of the plaintiff in its custody under the agreement set forth in the plaintiff's first prayer, is not to be determined by the care which the defendant may have seen fit to take of similar property of its own at the same time. And the fact that the defendant lost a large amount of its own moneys and securities at the same time, and in the same way, with the bonds of the plaintiff, is therefore not in itself sufficient to exempt the defendant from liability to the plaintiff in this action, unless the jury shall find that the care which the defendant took of its own property was reasonable care.

The defendant offered eleven prayers, of which all but the tenth were either granted by the Court or conceded by the plaintiff's counsel. The tenth, which the Court rejected, is contained in the opinion of this Court. The defendant excepted. The verdict and judgment were for the plaintiff, and the defendant appealed.

Third National Bank *vs.* Boyd.

The cause was argued before BARTOL, C. J., STEWART, BOWIE and ALVEY, J.

*Henry Stockbridge* and *Thomas Donaldson*, for the appellant.

The memorandum of the 5th of February, 1866, could not be construed as a contract made by the bank, as neither the discount clerk, nor the president who dictated its terms, had any power to make such contract for the bank, and it does not appear that such contract was ever authorized by the board of directors, or desired by them, or even known to them; and though such deposit, and subsequent deposits of the same nature, by the plaintiff, were known to the cashier, yet neither had he any authority to enter into such an undertaking for the corporation. Such powers are not vested in any of the officers named, and only the action of the board of directors, or the acquiescence of the board after knowledge of what had been done, could impose such a responsibility upon the bank. 13 *Stat. at Large,* 101; *Rev. Stat. of U. S.,* 998, 999; *Morse on Banking,* 128, 129, 133, 138; *Wiley vs. First National Bank of Brattleboro',* 47 *Vermont,* 546; *Foster vs. Essex Bank,* 17 *Mass.,* 497; *Lloyd vs. West Branch Bank,* 15 *Pa.,* 172; *Scott vs. National Bank of Chester Valley,* 72 *Pa.,* 471; *United States vs. City Bank of Columbus,* 21 *How.,* 356.

National Banks, under the terms of the Act of Congress, have no power to receive special deposits, either gratuitously or for hire; and if they were responsible for the plaintiff's bonds, while they were held as collateral security for indebtedness, that responsibility ceased with the indebtedness,—or certainly after the plaintiff had had a reasonable time to withdraw them; and no notice from the defendant, requiring such withdrawal, was necessary. *Wiley vs. First National Bank of Brattleboro',* 47 *Vermont,* 546; *First National Bank of Lyons vs. Ocean National Bank,* 60 *N. Y.,* 278; *Foster vs. Essex Bank,* 17 *Mass.,* 497; 1 *Sm. L. C.,* 338.

Even if the general principles laid down by the Court below in regard to the responsibility of the defendant in this case are correct, yet there was error in granting the plaintiff's first prayer; because a few points in the evidence are selected, and the jury are instructed that they may take those points into consideration, in forming a judgment on the question of whether there was exercise of the proper degree of care on the part of the defendant, in the custody of the plaintiff's special deposit. As there was a large body of evidence produced by both sides, bearing on this very question, and as all such evidence should have been fully considered by the jury, and due weight given to every part of it; and as the jury was the sole tribunal entitled to decide the relative importance of the various items of such evidence,—the terms of this instruction were not only misleading, but in this respect, were a direct invasion by the Court of the province of the jury. *Hurtt vs. Woodland,* 24 *Md.,* 417; *B. & O. R. R. Co. vs. Boteler,* 38 *Md.,* 568.

The measure of damages fixed in the instruction is error, the true rule being the value of the property at the time when it was demanded. *Maury and Osbourn vs. Coyle,* 34 *Md.,* 235.

*John H. Thomas* and *S. Teackle Wallis,* for the appellee.

Corporations are, on general principles, vested with all incidental powers which are necessary for the purposes of their organization, and which are not prohibited by their charter. *Plank Road Co. vs. Young,* 12 *Md.,* 477–84; *The Penna., Del. & Md. Nav. Co. vs. Dandridge,* 8 *Gill & John.,* 318–19; *Angell & Ames on Corporations, pages* 218–232, *Ch.* 8, *Sects.* 2 *and* 12, *Ed. of* 1846. Taking of special deposits is part of the ordinary business of banking. *Marine Bank vs. Fulton Bank,* 2 *Wal.,* 255, 256.

Power to make such contracts as that on which the appellant was sued in this case, was expressly conferred on National Banks by the Act of Congress, under which the

appellant was organized. *Act of Congress*, 3rd June, 1864, 13 *Stat. at Large, Brightly's Supplement, page* 58.

The 8th section of this Act empowers them to "exercise under this Act all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits, by buying and selling exchange, coin and bullion; by *loaning money on personal security*, &c." Personal security here, means the security of personal property. All of the other transactions previously mentioned, are on the security of persons. These words were added for the purpose of making it clear that National Banks were to have the right to take *personal property* as security, and by taking it, if accompanied, as in this case, with possession, to assume liability for its proper custody.

They are not prohibited from so taking it as security for either contemporaneous or future transactions. If the Act had intended so to limit their power, it would have done so in express language, as it did in reference to mortgages on real property. See *Sec.* 28.

A pledge may be given as well for a future and contingent debt, as for an existing one. *Story on Bailments, Sec.* 300 ; *Conard vs. Atlantic Ins. Co.*, 1 *Peters*, 448.

A bank is responsible for negligence in the discharge of its undertaking to collect a draft without any special consideration for the assumption of that duty. If such an undertaking be a legitimate element of banking business, the taking of collaterals for its own security must be equally so, and equally within the power of National as well as State Banks. *Chicopee Bank vs. Philadelphia Bank*, 8 *Wal.*, 641.

The contract was one which either party to it could terminate at pleasure, subject to such rights as had already accrued under it. The appellant had as much right to deliver the collaterals as the appellee had to demand them.

So long as neither of them exercised that right, they were held under the original contract.   The appellant recognized the distinction between them and similar property held by it as a gratuitous bailee.   It required all of its customers to remove boxes and valuables which they had left with it for their own accommodation and security merely, but retained the property in question, as collaterals, under the original agreement, and so held them at the time they were stolen.   Either party to a tenancy at will may terminate it.   But until it is terminated, both of them remain liable to all of its obligations.   So did both parties to this contract, so long as they permitted it to remain in force, as it was when the collaterals were stolen.   Under such circumstances, the liability of the appellant, to the full extent defined by the instructions of the Court, seems clear.   *Erie Bank vs. Smith, Randolph & Co.,* 3 *Brewster,* 9.

National Banks are liable for the loss of property held by them, merely for the accommodation of their customers, without any consideration for the keeping of it, except the profit derived from their customers doing with them their banking business.   But the Court below did not consider it necessary to decide, and did not decide that point.   It is not involved in this appeal.   *White vs. Bank,* 4 *Brewster,* 234; *Pattison vs. Syracuse Nat. Bank,* 4 *N. Y. Supreme Ct. Reports,* 96; *Scull vs. Kensington Bank, Leg. Int.,* for *March 25th,* 1873; *First Nat. Bank of Iowa vs. The Ocean Bank, Court of Common Pleas of New York,* 23rd *March,* 1873; *Smith vs. First National Bank in Westfield,* 99 *Mass.,* 605–11; *Scott vs. National Bank of Chester Valley,* 72 *Penn.,* 471.

The particular circumstances which the jury were told by the plaintiff's first prayer they *might,* not *must,* consider, were all proper for their consideration.   That prayer is not liable to the objection that it gave to these circumstances undue prominence.   Where a question of negligence or of care is one of mixed law and fact, there is no

other way in which a jury can be properly instructed on what their verdict ought to depend than by directing their attention to the particular facts into which they should inquire. *B. & O. R. R. Co. vs. Schumacher*, 29 *Md.*, 168, 174–5; *Maury and Osbourn vs. Coyle*, 34 *Md.*, 237; *Erie Bank vs. Smith, Randolph & Co.*, 3 *Brewster*, 9; *Story on Bailments*, *Secs.* 11, 12, 15, 17, 136, 332; *B. & O. R. R. Co. vs. Worthington*, 21 *Md.*, 275, 282–4; *Cumb. & Penn. R. R. Co. vs. State*, 37 *Md.*, 156; *Lamb vs. Camden & Amboy R. R. Co.*, 2 *Daly*, 454; *Ewalt & Myers vs. Harding & Hopkins*, 16 *Md.*, 170.

The right of a party in any case to segregate facts, and to ask proper instructions in reference to them is well established. *Williams vs. Woods, Bridges & Co.*, 16 *Md.*, 220; *Birney vs. N. Y. & Wash. Telegraph Co.*, 18 *Md.*, 341; *Parkhurst vs. N. Central R. R. Co.*, 19 *Md.*, 472; See also 17 *Wallace*, 382–383.

Even if the *degree* of care ought to have been defined in such legal language, the Court *did* so define it, at the instance of the appellant, and *did* instruct the jury that the plaintiff was not entitled to recover if the defendant had used *ordinary care*.

The plaintiff's first prayer properly rested his right to recover, "on the failure on the part of the defendant to exercise such care and diligence in the custody or keeping of them, (the collaterals,) as, at the time they were stolen, banks of common prudence, in like situation and business, usually bestow in the custody or keeping of similar property belonging to themselves," and his seventh instructed the jury, that it was their province to determine from all the facts and circumstances of the case, whether that amount of care had been used or not. *B. & O. R. R. Co. vs. Fitzpatrick*, 35 *Md.*, 32, 44.

It was no defence to the appellant that it had lost its own property, if it had not taken of it the necessary amount of care, and therefore the plaintiff's sixth prayer, in con-

nection with the defendant's ninth prayer, was properly granted. *Doorman vs. Jenkins, 2 Ad. & El.*, 258, (29 *E. C. L.*, 82); *Tracy vs. Wood, 3 Mason.* 132 ; 2 *Smith's Leading Cases,* 340 ; *Story on Bailments, secs.* 64–7 ; *Erie Bank vs. Smith, Randolph & Co.*, 3 *Brewster,* 9.

In this case there are two counts in *trover* and two in case—one for violation of the duty imposed by law to deliver the bonds when demanded, if no indebtedness existed, for which they had been pledged—the other of that to keep them with such care that they should not be lost through the default of the defendant. The evidence was that the bonds had been stolen in the interval between Saturday afternoon, the 17th, and Monday morning, the 19th of August, 1872. The conversion, if the count in *trover* was relied on, consisted not in the refusal to deliver them after they had been stolen, for then it was impossible—but in permitting them to be stolen.

If the counts in case were relied on, the obligation to keep the bonds so that they should not be lost by the fault of the defendant was broken by permitting them to be lost or stolen. The time of the loss of the bonds, under either count, was that at which the wrong to the plaintiff was done, and that at which the value of the property should be estimated. After the conversion was committed, or the liability in case had accrued, no demand to perfect the plaintiff's right was necessary, and his delay in making a demand which could not be complied with, did not have the effect of postponing the period at which the value of the property should be taken as a standard of damages. *Baltimore Marine Ins. Co. vs. Dalrymple,* 25 *Md.*, 304–5 ; *Williams vs. Woods, Bridges & Co.,* 16 *Md.*, 220, 259 ; *Dietus vs. Fuss, 8 Md.,* 157-8-9 *and* 160.

In actions on contracts, one is liable for the breach from the time he renders himself incapable of performing it, or refuses to perform it, or otherwise violates it. *Sedgwick on Damages, 6th Edit., page* 419, *note* 2, [352] ; *Williams*

*vs. Woods, Bridges & Co.*, 16 *Md.*, 220, 259; *Dugan vs. Anderson*, 36 *Md.*, 581, &c.; 1 *Robinson's Practice*, 453.

Neither plaintiff nor defendant can claim after either of these occurrences, that any *locus penitentiæ* remains which postpones the period at which the damages are to be estimated; nor can it be postponed by any subsequent demand for the performance of it made by the plaintiff, after the contract had been disaffirmed or violated by the defendant, or the performance of it had become impossible. *Williams vs. Woods, Bridges & Co.*, 16 *Md.*, 220, 259; *Baltimore Marine Ins. Co. vs. Dalrymple*, 25 *Md.*, 304–5.

BARTOL, C. J., delivered the opinion of the Court.

This suit was brought by the appellee, to recover the value of certain coupon-bonds and stocks, that passed like bank notes, by delivery; which had been deposited by the plaintiff with the defendant, and which had been stolen from the defendant, in consequence of its alleged failure to exercise ordinary care in the custody of them.

The case is one that, from its nature, depended at the trial below, mainly on the questions of fact arising upon the evidence, with regard to the manner in which the bonds were lost, and the vigilance and care exercised by the bank in their custody. These were questions exclusively for the jury, whose province it was to decide whether there was any want, or omission of ordinary care and diligence on the part of the bank, from which the loss of the plaintiff's property resulted. These questions were submitted to the jury by the Circuit Court, were decided by them against the bank, and we have no authority or power to review their verdict.

All the prayers asked by the defendant, being either conceded by the plaintiff's counsel or granted by the Circuit Court except the *tenth;* the only matters presented for our consideration on this appeal, arise upon the defendant's *tenth* prayer, which was refused; and the *first, fourth, fifth,*

*sixth* and *seventh* prayers of the plaintiff, which were granted.

It appears by the evidence that the appellant was a Bank organized under "*the National Currency Act of* 1864." The firm of William A. Boyd & Co., of which the appellee was senior member, was a large customer of the bank, through which all the banking business of the firm was transacted, and from which it received accommodations as needed. On the 5th day of February, 1866, the firm was indebted to the bank about $5000, when the appellee voluntarily proposed to the president of the bank, to deposit with the bank a large amount of bonds, about $37,000, as collateral security for his present and future indebtedness. The terms of the deposit as agreed on between Mr. Boyd and the president, were dictated by the latter to the discount clerk—and were as follows :

"THIRD NATIONAL BANK,
February 5th, 1866.

William A. Boyd has deposited with the Third National Bank of Baltimore $20,000 in United States 5-20 bonds, and $1500 5-20 July, 1865 ; $5000 Hudson County, New Jersey ; $5000 Town of Saratoga, New York, 7 *per cent.* bonds ; $5000 Stock of Third National Bank of Baltimore, as collateral security for the payment of all obligations of Wm. A. Boyd and Wm. A. Boyd & Co. to the Third National Bank of Baltimore, at present existing, or that may be incurred hereafter, with the understanding that the right to sell the above collaterals in satisfaction of such obligations, is hereby vested in the officers of the Third National Bank.

[Signed]      A. H. BARNITZ,
Discount Clerk."

This paper was kept by the cashier of the bank in the same envelope with the bonds,—afterwards *memoranda* were enclosed therein, signed by the appellee's attorney and by the cashier, showing that certain of the bonds orig-

inally deposited had been withdrawn, and others deposited to replace them.

It appears from the evidence "that while these collaterals remained in the bank, the firm kept a deposit account with the bank, having an average amount of about $4000 on deposit, and from time to time as it needed, obtained discounts ranging from $2000 to $15,000 on the security of the collaterals, but frequently, and for considerable times, as much as five months at a time, it sometimes owed the bank nothing, but left the bonds in its vault; that at times when the firm wanted money for a very short time, it had obtained it from the bank, on the security of these collaterals on what were called 'call loans' by checks such as the following:

Baltimore, July 13, 1871.

"Third National Bank of Baltimore pay to order of call loan on general collaterals, *four thousand dollars.*

William A. Boyd & Co."

" The firm was not indebted to the bank subsequent to July 1872, when it paid its last indebtedness; the bonds were not withdrawn, but left with the defendant, under the original agreement." The bank was robbed and the bonds stolen in the manner described in the testimony, between Saturday evening the 17th and Monday morning the 19th of August 1872. It appears from the proof that the giving of the bonds as collateral security, was the voluntary act of the plaintiff, not done at the instance or request of the defendant; that the bank officers considered the account of the plaintiff's firm a very desirable one, and considered the arrangement by which every liability of theirs was secured by the collaterals, very advantageous to the bank; "which was under no obligation to lend them anything; but the bonds and stocks were to be held as collateral security for all loans that might be made to them, and for their liability on any paper signed or

endorsed by them, which might at any time be held by the bank."

The defendant, by its *tenth* prayer, asked the Court to instruct the jury " That the defendant had no power, by the Act of Congress under which it was incorporated, to assume and undertake the keeping of the plaintiff's bonds, while they were not held as collateral security for debts owing to it, and if the jury shall find that when the bonds were stolen * * * * * * * there was not and had not been for nearly three weeks, any indebtedness for which they were held as security, then the plaintiff cannot recover in this action."

This prayer raises the question of the power of the bank to accept and retain the deposit of the plaintiff's bonds, in the manner and for the purpose disclosed in the evidence. Having been organized under the Act of Congress of 1864 ch. 106, the powers of the bank are limited and defined by the provisions of that Act.

*By section* 8, it is authorized " to exercise all such incidental powers as shall be necessary to carry on the business of banking by discounting promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits ; by buying and selling exchange, coin and bullion ; by loaning money on personal security, and by obtaining, issuing and circulating notes according to the provisions of this Act."

The construction of this section was considered by this Court in *Weckler vs. First National Bank of Hagerstown,* 42 *Md.,* 581. The precise question however now presented, did not arise in that case. There the attempt was made to hold the bank responsible for alleged fraudulent representations made by its teller in the sale of bonds of the Northern Pacific Railroad Company, which the *narr.* alleged the bank was engaged in selling on commission. It was decided, that " the business of selling bonds on commission was not within the scope of the powers of the corpo-

ration," under the Act of Congress to which we have referred. It was further held that the defence of *ultra vires* was open to the bank under the decision in "*The Steam Navigation Co. vs. Dandridge*, 8 *G. & J.*, 318, 319; and consequently that the bank was not responsible for any false representations made by its teller to the plaintiff, whereby she was induced to purchase the bonds in question." It is contended that the case now under consideration comes within that decision. In the argument of the cause, the counsel for the appellant has treated the transaction as a mere gratuitous deposit, simply for the convenience or accommodation of the appellee, and for the purpose of affording a place of safe-keeping for his bonds, and has argued that the bank had no power to accept a bailment of that kind, or in other words to become a mere safe deposit company, and was not therefore responsible for the loss. There is very strong ground, both upon reason and authority, in support of the proposition that a National Bank, deriving its existence and exercising its powers under the Act of Congress referred to, is not authorized to enter into a contract as a mere gratuitous bailee, by receiving on special deposit for safe-keeping merely, coin, jewelry, plate, bonds or other valuables. Such a contract does not appear to be authorized by the terms of the 8th section, as a transaction "within the ordinary course and business of banking or incident to it;" and has been decided by the Supreme Court of Vermont, to be unauthorized by the law, and beyond the scope of the corporate powers. *Wiley vs. First National Bank of Brattleborough*, 47 *Verm.*, 546. The very well considered opinion by Judge WHEELER in this case, will be found in *The American Law Register*, N. S., Vol. 14, *p.* 342, accompanied by an able note from the pen of Judge REDFIELD, in which the cases are collected and reviewed.

In the case of *The First National Bank of Lyons vs. The Ocean National Bank*, 60 *N. Y.*, 278, the Court

of Appeals of New York have recently made a similar decision.

Assuming these decisions to be correct, and we are not disposed to question their soundness ; it is clear that the contract entered into by the bank in this case, was not a mere gratuitous bailment.    As shown by the paper of February 5th, 1866, the bonds were not received on special deposit, *for safe-keeping merely*, but were received as collateral security for a debt then existing, and for all obligations that might thereafter be incurred by the depositor.

We entertain no doubt of the power of the bank to enter into a contract of that kind.    To accept such collateral security for existing debts, and for future loans and discounts is a transaction within the usual course of the business of banking, and incident thereto, and therefore within the terms of the Act of Congress.

The power of National Banks to receive such deposits, was distinctly recognized by the Supreme Court of Vermont, and the Court of Appeals of New York, in the cases before cited, and we are not aware that it has ever been questioned.    On this point we refer to the able opinion of Judge SHARSWOOD, in *Erie Bank vs. Smith, Randolph & Co.*, 3 *Brewster*, 9.

In *Maitland vs. The Citizens' National Bank*, 40 *Md.*, 540, this Court affirmed the right of a National Bank to receive on deposit, the note of a third person as collateral security for future loans or advances to the depositor.

The original contract of bailment being valid and binding, the obligation of the bank for the safe custody of the deposit, did not cease when the appellee's debt had been paid.    There is no evidence that the contract was changed, on the contrary, the evidence shows " the bonds remained with the bank under the original agreement," as collateral security for any indebtedness of the appellee that might thereafter accrue, and for any liability of himself or of the firm of which he was a member, or any paper signed or

endorsed by them, which might at any time be held by the bank. For these reasons the Circuit Court committed no error in refusing the appellant's tenth prayer.

The appellant's counsel have argued that the memorandum of February 5th, 1866, cannot be construed as a contract made by the appellant, because it does not appear that the officers by whom it was made, were authorized to bind the bank.

This point is not properly before us, was not made in the Circuit Court, and is not presented by the bill of exceptions. All the prayers of the appellant go upon the theory, that the bonds were held by the bank as collateral security.

But even if the question of the authority of the officers to bind the appellant, were open on this appeal, it may be observed that the contract of bailment being one which it was competent for the corporation to make, and having been made by its officers, acting within the scope of their general powers and apparent authority, and in the exercise of powers usually delegated to like officers, the bank would be estopped to deny their authority. It may be added further, that there was evidence from which the jury might properly have inferred, that the authority had been conferred upon the president and cashier, and that their acts were known to and sanctioned by the directors. *Union Bank vs Ridgely,* 1 *H. & G.*, 325, 413, 430.

But as we have before said, the question of the authority of the officers to act for the bank in the transaction is not before us. 29 *Md.*, 2, *Rule* 4.

With respect to the several prayers of the appellee which were granted by the Circuit Court, and referred to in the bill of exceptions, we do not understand that any objection is made to them by the appellant, so far as they instructed the jury upon the question of the degree of care which the appellant's officers were bound by law to exercise in the custody of the appellee's bonds. In this respect

they do not differ from the prayers granted at the instance of the appellant.

By the appellee's *first* prayer, the jury were instructed that the defendant would be responsible if the jury found from the evidence that the bonds had been stolen, "in consequence of the failure on the part of the defendant, to exercise such care and diligence in the custody or keeping of them as at the time, banks of common prudence in like situation and business, usually bestowed in the custody and keeping of similar property belonging to themselves; that the care and diligence ought to have been such as was properly adapted to the preservation and protection of said property, and to have been proportioned to the consequence likely to arise from any improvidence on the part of the defendant." No objection has been made, nor could any be justly urged against this proposition. The prayer further instructed the jury, that in determining whether or not such care and diligence were used, "the jury may take into consideration whether it was a proper precaution for the defendant to have had an inside watchman at night, and on Sundays, whether such watchman ought to have kept awake at night, and whether the bank ought ever to have been without an inside watchman at any part of the day on Sunday, and that they may take into consideration the nature and value of said bonds, their liability to loss, the temptation they offered to theft, the difficulty of recovering them if stolen, the situation of the building and vault, and the sufficiency of the safe in which the defendant kept them at the time they were stolen."

Exception has been taken to the last part of the prayer, because of the enumeration of certain questions, as proper to be considered by the jury, in determining whether such care and diligence had been used by the bank, as was defined in the prayer. But we find no error in this part of the instruction, the particular subjects of inquiry mentioned, were proper for the consideration of the jury; their

province was not invaded, nor was there anything to mislead them, they were not told that in any of the particulars mentioned, the evidence showed a want of due and ordinary care on the part of the bank ; and by the appellee's *seventh* prayer, they were instructed, "that it was a question to be determined by them from all the facts and circumstances in the case, whether there was or was not that degree of care and diligence used by the defendant, in the protection and preservation of the plaintiff's property which is defined in the plaintiff's first prayer."

The degree of care and diligence required by the law, was properly defined by the Circuit Court; the question whether it had been exercised by the defendant, was fairly submitted to the jury upon all the facts and circumstances of the case—this was a question of fact, exclusively within the province of the jury to decide; we have no power to disturb their verdict; and we have refrained from stating the facts and circumstances showing the manner in which the most extraordinary and unforseen robbery was committed upon the bank.

The only question left for us to consider is, as to the proper measure of damages. This was decided by the Circuit Court to be, "the value of the bonds at the time they were stolen." The appellant contends that this was error, and insists that the true measure is their value on the 9th day of September, 1872, when they were demanded by the appellee. It appears by the agreement of counsel, that the bonds had slightly diminished in value, between the time of the robbery and the time they were demanded. At the former date, they were worth $25,911.25, and at the latter, their value was $25,400.63.

In our opinion, the rule laid down by the Circuit Court is correct. In a case of this kind, the measure of damages is the value of the property lost, the only question is at what time is this value to be computed. Its value not being fixed and permanent, but liable to fluctuate, the

time fixed for ascertaining it, may become of much importance, and has been the subject of considerable discussion in the Courts, and the decisions are by no means uniform. In Maryland the measure of damages in *trover*, is ordinarily the value of the property at the time of the conversion, *Hepburn vs. Sewell*, 5 *H. & J.*, 211; *Sterling vs. Garritee*, 18 *Md.*, 468, and we think the same rule may, by analogy, be applied to the present case. Here the ground of the action is the alleged breach of the contract of bailment, by reason of the failure on the part of the bank to exercise due care in the custody of the bonds, whereby they were lost; the true measure of damages would seem to be their market value, computed at that time. This question arose in *Balto. Marine Ins. Co. vs. Dalrymple*, 25 *Md.*, 244. In that case there was a pledge or hypothecation of stock as collateral, the contract of bailment having been broken by the illegal sale of the stock by the bailee, the other party being cognizant of the breach, waited for two years, and the stock having risen in the market, demanded the same offering to redeem, and claimed that the value of the stock should be computed at the time of his demand. But it was held that the measure of damage was its value at the time of the breach.

Without repeating the reasons and authorities upon which that decision was placed, we refer to the opinion of the Court, at pages 305, 306, 307, 308.

In *Maury and Osbourn vs. Coyle*, 34 *Md.*, 235, cited by the appellant, it was ruled that the plaintiff was entitled to recover the value of the bonds deposited, ascertained at the date they were demanded. But that case is not applicable here, there was no evidence of the time when they had been lost, or that they had changed in value; and the contract there sued on, was not the same as this. In that case, by the contract of bailment, the bailee had the option to return the securities deposited, or their value in money on demand. In this case, the legal obligation

of the bailee, was to keep the bonds of the appellee safely, and to return *them* to him when the contract ended. Strictly, this obligation could not be discharged by the payment to the appellee of their value in money; after the bonds had been lost, and it had become impossible to return them, there was no necessity for a demand, and when made, it could have no significance or effect, in determining the rights of the parties, these had become fixed when the breach occurred by the loss of the bonds, and in our judgment, the proper measure of damages is their value computed at that time. Finding no error in the rulings of the Circuit Court, the judgment must be affirmed.

*Judgment affirmed.*

(Decided 1st March, 1876.)

