(Decided 8th June, 1875.)

SUSAN WECKLER *vs.* THE FIRST NATIONAL BANK OF HAGERSTOWN.

*Powers of a Bank—Rule for determining whether a Corporation can make a particular Contract—Powers of a Corporation— Selling Railroad bonds on commission, no part of the Legitimate business of National Banks—Defence of Ultra vires—Representations of the Teller of a National Bank in the Sale of Railroad bonds, do not make the Bank liable.*

A bank, like other private corporations, is confined to the sphere of action limited by the terms and intention of its charter.

In determining whether a corporation can make a particular contract, it must be considered, in the first place, whether its charter, or some statute binding upon it, forbids or permits it to make such a contract; and if the charter and valid statutory law are silent upon the subject, in the second place, whether the power to make such a contract may not be implied on the part of the corporation as directly or incidentally necessary to enable it to fulfil the purpose of its existence; or whether the contract is entirely foreign to that purpose.

A corporation has no other powers than such as are specifically granted, or such as are necessary for the purpose of carrying into effect the powers expressly granted.

A National Bank organized under the Act of Congress approved June 3, 1864, known as the "National Currency Act," has no authority to engage in the business of selling the bonds of railroad companies on commission; such business is not within the scope of its corporate powers, and is therefore prohibited.

In an action of deceit against a National Bank, to recover damages for the alleged false representations of its teller in the sale to the plaintiff of certain railroad bonds, it was HELD:

That the selling of railroad bonds on commission was not within the authorized business of a National Bank; and being thus beyond the scope of its corporate powers, the defence of *ultra vires* was open to it, and it was not responsible for any false representations which its teller might have made to the plaintiff, and by which she was induced to purchase the bonds.

APPEAL from the Circuit Court for Washington County. The case is stated in the opinion of the Court. The verdict and judgment being for the defendant, the plaintiff appealed:

The cause was argued before BARTOL, C. J., STEWART, GRASON, MILLER and ALVEY, J.

*H. H. Keedy*, for the appellant.

This is an action for deceit. Whether an action of this kind can be maintained against a private corporation is no longer an open question. *Tome vs. Parkersburg Branch R. R. Co.*, 39 *Md.*, 70 ; *Merchants' Bank vs. State Bank*, 10

*Wallace*, 644; *Barwick vs. Eng. Joint Stock Bank, L. R.*, 2 *Exch.*, 259; *Swift vs. Winterbotham, L. R.*, 8 *Queen's Bench*, 244; *Phil., Wil. & Balt. R. R. Co. vs. Quigley*, 21 *Howard*, 202.

The instruction of the Court is clearly erroneous, independent of the fact that it goes upon the assumption that the transaction complained of, was a purchase and sale of these bonds, which the facts in the case do not warrant, it lays down the broad proposition that the purchase and sale of bonds are not within the chartered powers of a National Bank. It has long been established by the American Courts, that the bonds of railroads, as well as State and Municipal bonds, made payable to bearer or holder, are negotiable instruments—commercial paper. *White vs. Vermont and Mass. Railway Co.*, 21 *Howard*, 575; *Mercer County vs. Hacket*, 1 *Wallace*, 95; *Gelpcke vs Dubuque*, 1 *Wallace*, 206; *Aurora City vs. West*, 7 *Wallace*, 105; *City of Lexington vs. Butler*, 14 *Wallace*, 295; *White vs. Railroad*, 21 *Howard*, 576; *Thomson vs. Lee County*, 3 *Wallace*, 331.

The ruling of the Court is then reduced to this, that the purchase and sale of negotiable instruments, or negotiable evidences of debt are not within the chartered powers of a National Bank. The National Banking Act, sec. 8, says: "Shall exercise under this Act, all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion." To discount, signifies the act of buying a negotiable instrument for a less sum than that, which upon its face, is payable, and to negotiate means "to sell, to pass, to transfer for a valuable consideration; as to negotiate a bill of exchange." (*See Bouvier's Law Dictionary, Discount, and Webster's Dictionary, Negotiate.*) Giving these meanings to these words, the ruling of the

Court below was in direct conflict with the very words of the statute. What can be meant by " *other evidences of debt,*" if it does not refer to the class of securities under consideration ?

If it is lawful for National Banks, under any circumstances, to sell bonds, the defence of *ultra vires* will not be available.

It will not be controverted that a National Bank can invest its own funds in bonds of the class in question ; that if it becomes tired of the investment or finds it unprofitable, it can sell these bonds and buy others, in other words, can change its investments. Nor will it be denied that if at one season of the year, its funds are more than sufficient to supply the demands of its customers, it could purchase bonds ; and at another season of the year when the wants of its customers increases, could sell them. It has been decided by this Court in *First National Bank of Charlotte vs. National Bank of Baltimore,* 39 *Md.,* 600, that a National Bank could legitimately even become possessed of stocks and sell them ; and if it could own stocks under certain circumstances, it could, surely, under similar circumstances, own bonds and sell them ; and again, it is usual for banks to loan money with bonds as collateral security, and upon default in payment, to sell such bonds. The law applicable to this branch of the case is well settled.

If the contract can be valid under any circumstances, an innocent party has a right to presume its validity, and the corporation is estopped from denying it. The appellant in this case, was an innocent party ; at the time of the transaction she was not made acquainted with the circumstances under which the appellee was selling these bonds ; the words used by the officers were, *"we can give you better bonds."* *Miners' Ditch Co. vs. Zellerbach,* 37 *Cal.,* 543 ; *Merchants' Bank vs. State Bank,* 10 *Wallace,* 644 ; 5 *American Law Review,* 283 ; *Rashdell vs. Ford, L. R.* 2 *Eq. Ca.,* 750 ; *Houghton vs. First Nat. Bank of Elkhorn,*

26 *Wisconsin*, 662 ; *North River Bank vs. Aymar*, 3 *Hill*, 262.

The buying and selling of bonds by a National Bank is not *ultra vires*. It is a fact known to all persons, that National Banks from their organization, have been engaged in the sale of Government and other bonds. They have advertised them ; their windows have been filled with fac-similes of them—and every means has been employed to give the public notice that such was a part of their business. It is not necessary that the Act of incorporation should give a bank particular power to do an act, to enable it to do it, for if so, its movements for all practical purposes, would not last for a day. It is sufficient if it is the ordinary course of banking business. *Bank of Ky. vs. Schuylkill Bank, Parsons' Sel. Cases,* 227.

In the face of an usage so broad and general, it would be a harsh rule to declare a transaction illegal or *ultra vires,* which had been entered into in good faith. Happily we are not without authority upon this question, for it has been directly settled by several decisions. *Caldwell vs. The Nat. Mohawk Valley Bank,* 64 *Barbour,* 333 ; *Van Leuven vs. First Nat. Bank of Kingston,* 54 *N. Y.,* 671, *and* 6 *Lansing,* 373 ; *Leach vs. Hale,* 31 *Iowa,* 70 ; *Matthews vs. The Mass. National Bank, in U. S. Circuit, March No. of* 1875, *Law Register,* 153 ; *Foster vs. Essex Bank,* 17 *Mass.,* 498.

*Albert Small* and *George Schley,* for the appellee.

Two questions only are involved in this issue.

First. Does an action of *deceit* lie against a corporation? and

Second. Conceding the facts alleged, and that the action will lie, is the appellee liable, the acts complained of being clearly *ultra vires*.

1. An incorporated company cannot, in its corporate character, be called on to answer in an action for deceit.

*Western Bank of Scotland vs. Addie, L. R.,* 1 *H. L. Sc.,* 145. The only late case in conflict, *Swift vs. Winterbotham P. O., L. R.,* 8 *Q. B.,* 244, is expressly overruled on appeal to the Exch. Cham. in same case *sub nom., Swift vs. Jewsbury, P. O., L. R.,* 9 *Q. B.,* 301. See *Benjamin on Sales, B.* 3, *ch.* 2, *sec.* 3, *pages* 336-350, and 8 *Amer. Law Rev.,* 631-648.

2. The acts complained of are *ultra vires,* and the appellee cannot be bound by any act or representation of its officer in this behalf. *Tome vs. Parkersburg Branch Railroad Company,* 39 *Md.,* 36 ; *Penn'a, Del. & Md. Steam Navigation Company vs. Dandridge,* 8 *Gill & John.,* 248 ; *Duncan vs. Maryland Savings Institution,* 10 *Gill & Johns.,* 299 ; *U. S. vs. City Bank of Columbus,* 21 *How.,* 356 ; *Merch'ts Bk. vs. Marine Bk.,* 3 *Gill,* 125 ; *Minor vs. Mech's Bk. of Alexandria,* 1 *Pet.,* 46 ; *Head vs. Providence Ins. Co.,* 2 *Cranch,* 127, 169 ; *Dartmouth College vs. Woodward,* 4 *Wheat.,* 518 ; *Bank of the U. S. vs. Dandridge,* 12 *Wheat.,* 64.

*Banking,* apart from the very elaborate definition given in the Act of Congress, is defined in *Duncan vs. Maryland Savings Institution, supra,* as "consisting of the right of issuing negotiable notes, discounting notes and receiving deposits," citing *The People vs. The President, &c., of the Manhattan Co.,* 5 *Conn.,* 383 ; *The People vs. The Utica Insurance Co.,* 15 *Johns.,* 390. And see *Angell & Ames, Corps., sec.* 55, *n.* 3 ; *Grant on Banking,* 1, 6, 381, 614 ; *Bank for Savings vs. The Collector,* 3 *Wall.,* 495. To this general definition the Act of Congress adds, "buying and selling exchange, coin and bullion."

The construction of the Act, since banking is not in itself a corporate franchise, but a limitation upon and in derogation of common law rights, must be strict and exclusive. *Curtis vs. Leavitt,* 15 *N. Y.,* 52 ; *Bullard vs. Bank,* 18 *Wall.,* 589. This section is a rescript of sec. 18 of the General Banking Law of New York, passed in 1838, and as to these provisions is *in totidem verbis.* The New York

Act has passed under careful scrutiny, and has met with frequent judicial interpretation. The question in this issue,—the power of a bank to traffic in stocks,—arose under the N. Y. Act, in *Talmage vs. Pell,* 7 *N. Y.,* (3 *Seld.,*) 327, and the Court, after conceding that stocks might be legitimately bought or taken for many purposes incident to the express power to conduct the business of banking, at p. 343, says: "The proposition, however, to be established, is the right to traffic in them, or to acquire them for the special objects contemplated by the arrangement of the parties in this case ; and these sections neither prove nor tend to prove any authority of that nature." * * * "I am, for the reasons suggested, of the opinion that this bank had no authority to traffic in stocks as an article of merchandise."

The same point was ruled in *Bank Commissioners vs. St. Lawrence Bank,* 7 *N. Y.,* 513 ; *Curtis vs. Leavitt,* 15 *N. Y.,* 168, and in *Barnes vs. Ontario Bank,* 19 *N. Y.,* 152.

In the construction of the powers of National Banking Associations, in other matters, as given in sec. 8 of the Act, similar views are held by the Supreme Court of Penn'a, in *Fowler vs. Sculley,* 72 *Penn'a St.,* 456, and in *The First National Bank of Lyons vs. The Ocean National Bank,* 60 *New York,* 278; *Shinkle vs. The First Nat'l Bk. of Ripley,* 22 *Ohio,* 516 ; *Shoemaker vs. The Nat'l Mech's Bk.,* 2 *Abbott U. S. Reps.,* 416 ; *and Stewart vs. The Nat'l Union Bk., Id.,* 424. And the principle announced in these cases is fully recognized by this Court in *The First National Bank of Charlotte vs. The National Exchange Bank of Baltimore,* 39 *Md.,* 610.

The only case in conflict is *Leach vs. Hale,* 31 *Iowa,* 69, and that is so evidently a case of Bailment, and nothing more, that not even the positive assertion of the Court can avail against the facts. The view taken in this case, too, is fully and satisfactorily controverted in the analogous case of *Wiley vs. The First National Bank of Brattleboro',*

47 *Verm.*, 546. The cases of *Caldwell vs. The National Mohawk Valley Bank,* 64 *Barb.*, 333, a State bank at the time of the contract, and *Van Leuven vs. The First Nat. Bk. of Kingston,* 6 *Lansing,* 373, *and* 54 *N. Y.,* 671,—a designated depository under sec. 45 of the Act, Rev. St. U. S., sec. 5153,—are for these reasons not in point, and the former is ignored, and the latter explained by the Court of Appeals of N. Y. in its latest utterance in 60 *New York,* 278.

The construction thus given is alike applicable to the purchase or sale of all kinds of marketable securities other than bills of exchange, where gain or any other purpose than those specially mentioned is the object of its dealing. Inasmuch, then, as the corporation itself could not lawfully engage in such purchase or sale, it could not authorize its agents so to deal, and the contracts or representations of the agent could not fall within the scope of his authority. *U. S. vs. The City Bank of Columbus,* 21 *Howard,* 556 And as persons dealing with the agents or officers of a corporation are held to know the powers of the corporation—*The Miner's Ditch Company vs. Zellerbach, et al.,* 1 *Withrow's Amer Corpn. Cases,* 275, (37 *Calif.,* 543,) there can be no implication of authority. *Pierce vs. Madison & Ind. R. R. Co.,* 21 *How.,* 443. Nor will a corporation be held liable for the fraud of its agent committed *colore officii. Mayor and C. C. vs. Eshbach,* 18 *Md.,* 276 ; *Same vs. Reynolds,* 20 *Md.,* 1 ; *Co. Comm'rs A. A. Co. vs. Duckett,* 20 *Md.,* 468 ; *Horn vs. Mayor and C. C.,* 30 *Md.,* 218 ; *Foster vs. Essex Bank,* 17 *Mass.,* 599 ; *Mechanics' Bk. vs. N. Y. and N. H. R. R. Co.,* 13 *N. Y,* (3 *Kern.,*) 600.

Is the appellee estopped from making such a defence?

The doctrine of estoppel, as applicable to such a defence by a corporation, is very clearly put in *Hood vs. N. Y. & N. H. R. R. Co.,* 22 *Conn.,* 1, 502, thus :—

" Where a corporation has the power to do an act, they may be estopped from objecting that the form they adopted

was not the exact mode prescribed by the charter; but where the question is one of power, they cannot be deemed estopped to deny that they have done what they never could by legal possibility have done." And this principle is held and enforced in *The Penn'a, Del. & Md. Steam Navigation Co. vs. Dandridge*, 8 *G. & J.*, 248, and cases cited at p. 320; in the cases last above cited, and in *Albert and Wife vs The Savings Bank*, 2 *Md.*, 159.

MILLER, J., delivered the opinion of the Court.

A question of importance and of first impression in this State arises on this appeal. The suit was instituted by the appellant against the appellee, a National Bank organized under the Act of Congress approved June 3rd, 1864, known as the "National Currency Act." The first and second counts of the declaration aver in substance, that the defendant as part of its business as such banking association, was engaged in the sale of the bonds of the Northern Pacific Railroad Company, and in soliciting orders for the purchase of the same and receiving commissions for such sales and orders, and by means of certain specified false, fraudulent and deceitful representations made by its teller, the plaintiff was induced to and did purchase from the bank two of said bonds of $500 each, and paid the bank therefor the sum of $1000 and was thereby damnified. The case was tried upon issue joined on the plea of not guilty. There was conflicting proof as to the making of the alleged false representations by the teller. The Court rejected all the prayers offered on both sides and instructed the jury in effect that the National Banking Act under which the defendant was organized, limits the action of the bank to the pursuit of the objects specified in the Act of Congress, and that the purchase and sale of such bonds is not within the chartered powers of the defendant, and that the plaintiff cannot recover against the defendant in this action, although the jury may find from the evi-

dence that the teller of the bank fraudulently induced the plaintiff to purchase the bonds in question by making the alleged false representations, and that she suffered loss thereby. This presents broadly and clearly the question whether the bank has authority under the Act of Congress to engage in the business of selling bonds of railroad companies on commission.

A bank, like other private corporations, is confined to the sphere of action limited by the terms and intention of its charter. The Supreme Court, in the case of the *Bank of the United States vs. Dandridge*, 12 *Wheat.*, 68, states the rule by which the powers of the bank are to be determined thus : " Whatever may be the implied powers of aggregate corporations by the common law, and the modes by which those powers are to be carried into operation, corporations created by statute must depend both for their powers and the mode of exercising them, upon the true construction of the statute itself." And in that case the Court adopt, as entirely correct and applicable to the bank, the doctrine laid down by Ch. J. MARSHALL, in 2 *Cranch*, 167, in reference to an Insurance Company, viz : " Without ascribing to this body, which in its corporate capacity is the mere creature of the Act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may be correctly said to be precisely what the incorporating Act has made it, to derive all its powers from that Act, and to be capable of exerting its faculties only in the manner in which that Act authorizes." And in this State the law is well-settled that a corporation created for a specific purpose not only can make no contract forbidden by its charter, but in general can make no contract which is not necessary either directly or incidentally, to enable it to answer that purpose. In deciding, therefore, whether a corporation can make a particular contract, it must be considered in the first place, whether its charter or some

statute binding upon it forbids or permits it to make such a contract ; and if the charter and valid statutory law are silent upon the subject, in the second place, whether the power to make such a contract may not be implied on the part of the corporation as directly or incidentally necessary to enable it to fulfil the purpose of its existence ; or whether the contract is entirely foreign to that purpose ; a corporation has no other powers than such as are specifically granted, or such as are necessary for the purpose of carrying into effect the powers expressly granted. *Steam Nav. Co. vs. Dandridge*, 8 *G. & J.*, 318, 319. We must, therefore, determine the true construction of the Act of Congress authorizing the formation of these banking associations, and whether the power to make contracts like the one in question is expressly conferred upon them, or is directly or incidentally necessary to enable them to fulfil the purpose of their creation, or is entirely foreign to that purpose.

So far as the purpose of the law is indicated by its title, it is, " to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof." After prescribing in previous sections the mode by, and the conditions under which banking associations may be formed, the 8th section declares that every association so formed shall become a body corporate, from the date of its certificate of organization, but shall transact no business " except such as may be incidental to its organization, until authorized by the Comptroller of the currency to commence the *business of banking.*" Power is then given it to adopt a corporate seal, to have succession by the name designated in its organization certificate, and in that name to make contracts and sue and be sued, to elect directors and other officers, " and exercise under this Act all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes,

drafts, bills of exchange, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, by loaning money on personal security, and by obtaining, issuing and circulating notes according to the provisions of this Act." This is the only portion of the statute to which, for the purposes of this case, it is necessary to refer. By it the associations are not simply incorporated *as banks,* and the scope of their corporate business left wholly to implication, but the kind of banking which they may conduct is limited and defined. As we read the language of this 8th section, it authorizes the associations to carry on banking "by discounting and negotiating promissory notes," &c., and to exercise "all such incidental powers" as shall be necessary to conduct *that business.* The mode in which the incidental powers may be exercised is not defined, but all incidental powers which they can exercise must be necessary or incidental to the business of banking, thus limited and defined. To the usual attributes of banking, consisting of the right to issue notes for circulation, to discount commercial paper and receive deposits, this law adds the special power to buy and sell exchange, coin and bullion, but we look in vain for any grant of power to engage in the business charged in this declaration. It is not embraced in the power to "*discount and negotiate*" promissory notes, drafts, bills of exchange and other evidences of debt. The ordinary meaning of the terms "to discount," is to take interest in advance, and in banking is a mode of loaning money. It is the advance of money not due till some future period, less the interest which would be due thereon when payable. The power "to negotiate" a bill or note is the power to endorse and deliver it to another so that the right of action thereon shall pass to the endorsee or holder. No construction can be given to these terms as used in this statute, so broad as to comprehend the authority to sell bonds for third parties on commission, or

engage in business of that character. The appropriate place for the grant of such a power would be in the clause conferring authority to " buy and sell," but we find that limited to specific things, among which bonds are not mentioned, and upon the maxim, *expressio unius est exclusio alterius*, and in view of the rule of interpretation of corporate powers before stated, the carrying on of such a business is prohibited to these associations. Nor can we perceive it is in anywise necessary to the purpose of their existence, or in any sense incidental to the business they are empowered to conduct, that they should become bond-brokers or be allowed to traffic in every species of obligations issued by the innumerable corporations, private and municipal, of the country. The more carefully they confine themselves to the legitimate business of banking, as defined in this law, the more effectually will they subserve the purposes of their creation. By a strict adherence to that, they will best accommodate the commercial community, as well as protect their shareholders.

Such is our construction of this statute, and it is supported by the best considered authorities and the decided preponderance of judicial opinion in other States. This eighth section is almost identical in terms (and as respects the present question completely so) with the Banking Act of New York, of 1838, ch. 260, and the Court of Appeals of that State, in *Talmage vs. Pell*, 3 *Selden*, 328, held that Banking Associations formed under that law have authority only to carry on the business of banking in the manner and with the powers specified in the Act, and have no power to purchase State stocks, to sell at a profit or as a means of raising money, except when received as security for a loan, or taken in payment of a loan or debt. In speaking of the transaction under review in that case, the Court say the Banking Company "purchased these bonds as they might have purchased a cargo of cotton to send to market to be

sold at the risk of the vendor for the highest price that could be obtained. No authority to traffic in either commodity is expressly given by the law of 1838. It is, therefore, claimed as a power incident to the business of *banking*. But the 18th section of the Act declares that this business shall be carried on by discounting bills, notes and other evidences of debt, by loaning money on real and personal security, by buying and selling gold and silver bullion, foreign coin and bills of exchange, &c. The subjects pertaining to the business of banking are designated, and the express powers of the association are limited to them, and to such incidental powers as may be necessary to transact the business thus defined by the Legislature."

They then proceed to show that the claim to base the validity of the contract upon any incidental power was unfounded, and pronounce the transaction illegal, and the assignment by the company of mortgages which they held as collateral security for the purchase, void. So also in recent decisions of the Courts of last resort in several of the States where this Act of Congress, and especially its 8th section, has been considered, we find it construed in entire accord with the view we have taken of it. We refer to *Fowler vs. Scully*, 72 *Penn. State Rep.*, 456; *Shinkle vs. First National Bank of Ripley*, 22 *Ohio*. 516; *Wiley vs. First National Bank of Brattleboro*, 47 *Vermont*, 546, *and First National Bank of Lyons vs. Ocean National Bank*, 60 *New York*, 278. In the last mentioned case there is a very able opinion of the Court by ALLEN, J., in which he says he fully concurs in the views expressed by Judge WHEELER in the Vermont case, and, in reference to the case of *Van Leuven vs. First National Bank of Kingston*, shortly reported (the opinions of the Judges not being given) in 54 *N. Y. Rep.*, 671, which has been pressed upon our attention by the appellant's counsel, he says it decided no general principle, but by a divided Court it was determined "that the contract in that case, under the circumstances,

was the contract of the corporation, and not the individual contract of the president."

We are therefore clearly of opinion that this business of selling bonds on commission, is not within the scope of the powers of the corporation, and the bank could not, under any circumstances, carry it on; and being thus beyond its corporate powers, the defence of *ultra vires* is open to the appellee. 8 *G. & J.*, 248. And it follows from this that the bank is not responsible for any false representations made by its teller to the appellant, by which she was induced to purchase the bonds in question. Hence there was no error in the Court's instruction to the jury nor in the rejection of the appellant's first and second prayers.

But by the third and fourth counts of the declaration, and the appellant's third and fourth prayers it is sought to give another character to the transaction, and to place the right to recover upon a different ground. They present the case in this view, viz.: that there was no *sale* and *purchase* of the bonds, but by the false representations of the teller the appellant was induced to *receive* them instead of money, *in payment* of the draft on New York, which she presented at the bank to be cashed or collected. It is argued that in this aspect, the transaction amounts to the same thing as if the teller had cashed the draft, by paying her over the counter in depreciated or worthless bank notes, representing them to be good. But the answer to this position is, that there is no evidence in the record to support it. The proof shows that on the 6th of October, 1871, the appellant presented at the bank a draft on New York, for $1047, and asked Mr. Newcomer, the teller, if it was good and if he would cash it. The teller gave her $47 in money, and a *certificate of deposit* for the balance to the effect that she "has deposited in this bank $1000, payable to the order of herself on return of this certificate properly endorsed." This instrument is in the usual form of a certificate of deposit, bears date the 6th of Octo-

ber, 1871, and is signed by the teller for the cashier. There is a discrepancy in the testimony as to whether anything was said at that time about investing her money in Northern Pacific Bonds. According to her testimony, as stated in the record, it may be inferred the alleged false representations were then made, but whether before or after she received the certificate of deposit does not clearly appear, and according to the testimony on the other side, nothing was said about these bonds until some ten or twelve days thereafter, when she returned and insisted upon investing her money. But it is immaterial when this occurred, because it is an undisputed fact that she received and accepted the certificate on that day, long before the bonds were delivered to her. The draft to the extent of $1000 was received by the bank as money, and as such it passed to her credit, and she became the creditor of the bank for that amount as an ordinary depositor. Whatever may have been said at or before this time, it is clear beyond dispute that by this transaction, the draft was, as between the bank and herself, cashed or converted into money which became hers in the coffers of the bank, to use and dispose of as she saw fit. It is further shown by undisputed testimony, that these bonds were ordered by the cashier from the Baltimore brokers, and received on the 19th of October, 1871, a few days after the order for them was sent; that they remained in the bank until some time in April following, when the appellant either in person or through an agent *returned the certificate of deposit*, and got the bonds, paying the interest accrued at the time of the purchase out of the January coupons on the bonds which the teller then cashed for her; that she thereafter retained the bonds, collecting the interest upon them up to July 1st, 1873, and that they were sold in the market at par and accrued interest up to the financial crisis in the fall of 1873. From these facts the law can regard the transaction in no other light than as a *purchase* of these

bonds by the appellant through the teller or cashier, she paying therefor her own money deposited to her credit in the bank. It was entirely competent for the bank to receive the draft for collection, or to accept and receive it as a deposit of so much money, and there is no evidence in the case legally sufficient to authorize a jury to infer that the teller, (acting as he would be in that respect in the discharge of his duty, and within the scope of his employment,) cashed that draft by passing off upon her these bonds instead of money in payment therefor. For these reasons there was no error in the rejection of the two last prayers of the appellant, and the judgment must be affirmed.

Having disposed of the case in this way, it becomes unnecessary to express any opinion upon the question argued at bar, whether an action like this will lie against a corporation in its corporate character, for deceit practiced by its officers or agents.

*Judgment affirmed.*

(Decided 8th June, 1875.)