## SIMONS et al. v. FISHER.

(Circuit Court of Appeals, Third Circuit. May 23, 1893.)

1. NEGOTIABLE INSTRUMENTS—BONA FIDE HOLDERS—EVIDENCE.

In an action by the receiver of a national bank on a note made by defendants to their own order, and indorsed by them, the note clerk of the bank testified to entries on the discount book indicating that the note was discounted on a certain day, and that the account of the proceeds was handed to the president, who put his signature upon it, thus making it an order on the teller for the amount therein stated; that this order was returned to the clerk, together with the president's own check for an amount sufficient to make up the face of the note; and that this amount was used to pay a former note of defendants. As to the former

note, he testified to entries on the discount book indicating that it had been discounted, and that the proceeds were deposited to the credit of the president. The bank shortly became insolvent. *Held*, that this did not sufficiently show the bank was a bona fide holder for value, as against the defense that the notes were procured from defendants by the president, who was also the sole managing officer of the bank, by fraud and without consideration. Butler, J., dissenting.

2. SAME—FRAUD IN PROCUREMENT.

Defendants offered to show that the note in suit, and former notes which were renewed by it, were given at the solicitation of the president, who in the actual conduct of the business of the bank was its sole managing officer, and upon his execution of a receipt, also offered in evidence, reciting that the note was for the use of the bank and was to be paid by it at maturity; and that he stated that he proposed to use it in the clearing house, as it would look better for the credit of the bank than numerous small notes which it held, and which it would retain to protect this note of defendants. The court refused to admit the evidence offered. *Held*, that this was error, as the facts, if shown, would make a valid defense to the action. Butler, J., dissenting.

3. SAME—AUTHORITY OF BANK PRESIDENT.

It was also error to refuse defendants' offer to show that the president was the sole managing officer of the bank, in the actual conduct of its business, and that the cashier occupied more the position of a clerk than that of actual cashier; for, if the president exercised the functions of cashier, and was the sole managing officer of the bank, he had authority to borrow money for the use of the bank in the regular course of its business. Butler, J., dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

At Law. This was an action by B. F. Fisher, receiver of the Spring Garden National Bank, against John F. Simons, Frederick M. Simons, and Edwin S. Simons, partners trading as Simons, Bro. & Co., on a note. The court directed a verdict for plaintiff, and defendants bring error. Reversed.

Robert H. Hinckley, for plaintiffs in error.

Silas W. Pettit, (D. H. Stone and Read & Pettit, on the brief,) for defendant in error.

Before ACHESON, Circuit Judge, and WALES and BUTLER, District Judges.

ACHESON, Circuit Judge. This was a suit brought by the receiver of the Spring Garden National Bank against the firm of Simons, Bro. & Co. upon a promissory note dated Philadelphia, February 13, 1891, at three months, for $5,000, made by the defendants to their own order, and by them indorsed.

At the trial the plaintiff, instead of relying upon the presumption arising from the mere possession of the note that the bank was a bona fide holder for value, for the purpose, evidently, of anticipating and precluding the defense, examined, as part of his case in chief, the note clerk of the bank, who testified to entries on the discount book indicating that the note in suit was discounted by the bank on February 17, 1891. He then stated:

"The account of the proceeds—$4,940.67—was handed to President F. W. Kennedy, who put his signature on it, making it an order on the teller for that much money. After the president had put his signature on this O. K.

slip, it was returned to me with his own check for $59.33, the two together making it $5,000. It was used to pay a former note of Simons, Bro. & Co. of $5,000."

Touching the former note which bore date October 15, 1890, this witness testified to entries on the discount book indicating that it was discounted by the bank on November 20, 1890, and he stated that for the proceeds "an O. K. slip was issued and deposited to the credit of F. W. Kennedy in his ledger account." F. W. Kennedy was the president of the bank.

Such being the plaintiff's case, the defendants' counsel made the following offers, one of the defendants being on the witness stand:

First. "I offer to show that this note, dated October 15, 1890, at four months, for $5,000, was delivered to the president of the Spring Garden National Bank on or about November 20, 1890, which note was the first of a series of four notes given by the firm to the president, and taking from him at the time an acknowledgment in writing, signed by him as president of the bank, that he received this note for the use of the bank, and to be paid by it at maturity; and saying also at the same time to the witness that he desired to use this note in the clearing house; that he had a large quantity of small mercantile paper that he did not care to put through the clearing house, as it would look better for the bank to have a large note of a responsible firm like Simons, Bro. & Co. to go into the clearing house, and that he would retain these small mercantile notes to protect Simons, Bro. & Co. I propose to show that the receipt was given by the president in the banking house."

Second. "I offer to show that on the 8th of December, 1890, the witness, having been called upon by the president of the bank to give two additional notes to the one of October, 1890, visited the banking house, and there had a conversation with the president, in which he stated that it was necessary for the bank to have large promissory notes of a firm of the standing of Simons, Bro. & Co. for use in the clearing house; that the bank was entirely solvent, that they had a quantity of mercantile paper of small amounts, which the president would lay aside for the protection of Simons, Bro. & Co. if they would loan them the use of their credit by giving the notes he asked for,—four in all; and that at the date of this interview, December 8, 1890, at the banking house, the president gave the witness the receipt dated December 8, 1890."

Each of these offers was overruled. The defendants' counsel then recalled the note clerk, and made the following offer:

"I recall the witness for the purpose of showing that in the actual management of the business of the Spring Garden National Bank the president was the sole managing officer; that the cashier occupied the position more of a clerk than of actual cashier in the sense in which that word is used in the authorities cited by my friend."

This offer was also overruled.

In connection with the above offers of evidence, the defendants offered receipts given them by the president of the bank, of which the following are copies:

"Dec. 8/90. Received of Simons, Bro. & Co. their four promissory notes for $5,000 each, dated as follows: No. 1,151, Oct. 15/90; No. 1,152, Oct. 31/90; No. 1,172, Nov. 15/90; and No. 1,174, Dec. 8/90; all at four months,—which notes are for the use of the bank and to be paid by it.

"Francis W. Kennedy, Pt."

"February 24/91. Received of Simons, Bro. & Co. their note 1,231, dated February 13/91, 3 mos., $5,000, which note is for the use of the bank, and to be paid by it. Francis W. Kennedy, Pres't."

By direction of the court the jury rendered a verdict for the plaintiff.

In dealing with this case we must at the outset assume two things: First, the actual good faith of the plaintiffs in error in the transactions between them and the president of the bank; and, second, that they could have shown the facts to be as set forth in their offers. Were those offers properly rejected? In answering this question it is first to be noticed that Simons, Bro. & Co. were not in court as plaintiffs seeking to enforce as against the bank a contract made in its behalf by its president. They were defending against a note, for which they had received no consideration, made for the accommodation of the bank at the instance of its president, and delivered to him in his official capacity for the use of the bank in its clearing house business. Now, it is a familiar principle that in an action by the indorsee against the maker of a promissory note proof by the defendant that the note was fraudulently obtained from him puts the plaintiff to proof that he is a bona fide holder for value. Lerch Hardware Co. v. First Nat. Bank of Columbia, 109 Pa. St. 240; Stewart v. Lansing, 104 U. S. 505. The evidence here made the ground for excluding the defendants' offer strikes us as very meager and inadequate. The circumstances connected with the alleged "regular discount" of the paper were not shown. Whether the paper came before the board of directors at all was left to mere inference from book entries. Indeed, the testimony of the note clerk rather suggests that in this matter Francis W. Kennedy, the president of the bank, was permitted to exercise unlimited control. Nor did it appear that the bank directly paid any money to Kennedy. The most shown was that a credit was entered in his account with the bank, but the state of that account then or afterwards was not disclosed. Now, if a bank, or its receiver, can successfully maintain an action against an innocent maker of a promissory note which came to it by the hands of its own president, who, acting in its behalf, and as its representative, procured the note for the accommodation of the bank in the course of its regular business, surely it can only be upon fuller proofs than this record discloses that the bank became a bona fide holder of the note for value.

But the defense did not rest alone upon Kennedy's official character as president of the bank. The defendants' counsel offered to show that "in the actual management of the business of the Spring Garden National Bank the president was the sole managing officer; that the cashier occupied the position more of a clerk than of actual cashier in the sense in which that word is used in the authorities cited by my friend." The latter clause of this offer does not weaken what immediately precedes. Evidently it was intended to meet authorities which had been cited to show the powers with which the cashier of a bank is ordinarily invested, virtute officii, as distinguished from those usually appertaining to the office of president. The fair meaning of the offer, as a whole, was to show that, as the affairs of the Spring Garden National Bank were ac-

tually conducted, the president was "the sole managing officer," performing, among other functions, those of a cashier. Assuming the president to have been "the sole managing officer" of the bank in the conduct of its business, can the bank, or its receiver, recover against the defendants upon a note procured from them by its president in the manner, for the purpose, and under the arrangement set forth in the defendants' offers? We think not.

It is, indeed, urged that the transaction which the defendants proposed to show was ultra vires. But, if it were, it does not follow that the bank can set up its want of legal capacity to compel Simons, Bro. & Co. to pay their accommodation note, made solely for the benefit of the bank itself. Bank v. Case, 99 U. S. 628; Bank v. Graham, 100 U. S. 699. The transaction, however, was not ultra vires. It was a loan to the bank of an accommodation note apparently for legitimate use at the clearing house in lieu of mercantile paper of small amounts, which was to be set apart and held by the bank for the protection of Simons, Bro. & Co. In Morse, Banks, § 160, it is said, (and the text seems to be well supported by the cited authorities:) "The cashier has inherent power to borrow money in the regular course of the business of the bank, and may secure the loan by note or pledge of the bank's property." In Coats v. Donnell, 94 N. Y. 168, 176, the court of appeals said: "The cashier of a bank is its executive officer, and it is well settled that as an incident of his office he has authority, implied from his official designation as cashier, to borrow money for and to bind the bank for its repayment; and the assumption of such authority by the cashier will conclude the bank as against third persons who have no notice of his want of authority in the particular transaction, and deal with him on the basis of its existence." But if the cashier as the executive officer possesses such authority, why not a president, who, "in the actual management of the business" of a bank, is also its "sole managing officer?"

The case of Coats v. Donnell, supra, had features very like those appearing here. The cashier of a bank orally agreed with a firm that if the latter would accept certain drafts negotiated by the bank, it would keep on deposit with the firm until their maturity a balance equal to the amount of the drafts, upon which the firm should have a lien; the firm to be kept informed of the condition of the bank, which the cashier stated to be embarrassed, but, with certain expected aid, able to continue business. The agreement was held to be valid, and within the power of the cashier to make, both under his general authority and by virtue of a by-law which gave him supervision of the bank, with the duty to attend to the making of loans, discounts, and other active business transactions of the bank.

In Merchants' Bank v. State Bank, 10 Wall. 604, 644, the supreme court said:

"Where a party deals with a corporation in good faith, the transaction is not ultra vires, and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there

is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them. * * * Smith was the cashier of the State Bank. As such he approached the Merchants' Bank. The bank did not approach him. Upon the faith of his acts and declarations it parted with its property. The misfortune occurred through him, and, as the case appears in the record, upon the plainest principles of justice the loss should fall upon the defendant. The ethics and law of the case alike require this result. Those who created the trust, appointed the trustee, and clothed him with the powers that enabled him to mislead, if there were any misleading, ought to suffer rather than the other party."

This language was used with reference to the cashier of a national bank. We think it has great pertinency here, where the receiver of the Spring Garden National Bank is attempting to compel Simons, Bro. & Co. to pay a promissory note, with no consideration behind it, made by them for the accommodation of the bank in its clearing house business, upon the solicitation of its president, who, (as the defendants proposed to show,) "in the actual management of the business" of the bank, was "the sole managing officer."

We have only to add that if the president of the bank wrongfully appropriated the note or its proceeds to his individual purposes, Simons, Bro. & Co. are not to be prejudiced by the fraud he perpetrated upon his principal. Bank v. Armstrong, 50 Fed. Rep. 798.

We are of the opinion that the evidence under all of the defendants' offers should have been received.

The judgment is reversed, and the record is remanded to the circuit court, with directions to set aside the verdict and grant a new trial.

BUTLER, District Judge, (dissenting.) The defendants' offer of testimony raises the only question presented. The court holds the offer admissible: First, because the plaintiff (below) did not prove consideration for the indorsement, and, second, because the facts stated in the offer constitute a defense, even with such proof. I am not prepared to assent to the first position, though I do not consider it very important. Production of the note was, of itself, sufficient proof of such consideration, in the first instance. The defendants could have put plaintiff to further proof by proper averments, and call for it by the usual notice before trial. I am not satisfied that such averments were made, and the customary notice was not given. In support of the court's views in this respect, Stewart v. Lansing, 104 U. S. 505, and Lerch Hardware Co. v. First Nat. Bank of Columbia, 109 Pa. St. 240, are cited. In the first it does not appear whether such notice was given or not. As authority for the general statement there found, Smith v. Sac Co., 11 Wall. 139, is cited. In that case the issue (of plaintiff's bona fides) was distinctly raised by the pleadings. Where the common-law method of pleading is pursued the question is al-

ways raised by notice. (Holme v. Karsper, 5 Bin. 471;) and the practice of giving such notice is still observed where new methods have been adopted. Since the introduction of affidavits of defense in Pennsylvania, it has been held sufficient to prevent judgment by default to aver fraud in the inception of the note. Whether, however, this contemplates the customary notice to prove consideration is not entirely clear. An examination of the cases leaves the mind in some doubt. In practice the notice is usually given. Where, however, the alleged fraud is not connected with the inception of the note, but with the use made of it, the rule requiring proof of consideration by the indorsee, does not apply. The distinction seems shadowy, if not unreasonable, but it is well settled. Sloan v. Banking Co., 67 Pa. St. 472; Hutchinson v. Boggs, 28 Pa. St. 296. Whether, in view of the affidavit, the fraud here involved, was connected with the inception of the note, or simply with the use subsequently made of it, is too nice a question to be considered without greater occasion for it than exists. The affidavit avers that the note was executed for the bank's use. If so, it might well be argued that the fraud consisted in applying it to another purpose. Nor am I satisfied that if the question was properly raised, so as to put the plaintiff to proof of the bank's bona fides, he has not furnished it. In his sworn statement he distinctly avers that the note was taken in due course and for valuable consideration; and this is not denied in the affidavit of defense. On the trial he showed that the note was discounted and the proceeds placed to Kennedy's credit. It is by no means clear that this was not sufficient proof under the circumstances. Shoe Co. v. Eichenlaub, 127 Pa. St. 169, 17 Atl. Rep. 889. It is unnecessary, however, to discuss either of these questions because as the case must go back for retrial they can be eliminated by the customary notice, or without it by proof that Kennedy drew against the credit. If nothing else was embraced in the decision I would not, therefore, feel called upon to express dissent. The second proposition stated above is, however, vital to the parties' rights, and so important generally, that it seems to be my duty to express a dissent, and to state my reasons therefor.

The proposition is that even though the bank received the note in good faith, paying value, the facts alleged in the offer constitute a defense. These facts are substantially that Kennedy, president of the bank and "its sole managing officer," obtained the note without consideration, for the bank's use in its clearing house transactions. That the act of Kennedy was a pure fraud is not doubted. He desired the note for his individual purposes alone, and so used it. Nevertheless if he had authority to represent the bank in the transaction it stands in his shoes, and cannot recover, notwithstanding it received the note in good faith, for value. That his office as president, did not confer such authority is, I think, reasonably clear. The duties and powers of national banks, of their presidents, directors and other officers, are derived from the statute, relating to this subject. The provisions principally applicable

are found in section 5136 of the Revised Statutes, and are as follows: "The bank may exercise by its board of directors, or duly-authorized officers or agents, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security, and by obtaining, issuing and circulating notes, according to the provisions of this statute;" also "that the bank may elect or appoint directors, and by its board of directors appoint a president, vice president, cashier, and other officers, define their duties, * * * and dismiss them at pleasure;" may also "prescribe, by its board of directors, by-laws regulating the manner in which its stock shall be transferred, its directors and other officers elected or appointed, its property transferred, its general business conducted, and the privileges granted to it by law exercised or enjoyed."

The president and cashier are the executive officers of the bank, and as such may represent it in the routine business ordinarily transacted by these officers; but without any express or implied delegation of authority by the directors, they cannot represent it in, and bind it to, such transactions as that under consideration. If they can, what becomes of the office of directors, to whom, for the protection of stockholders and the public, the management of the bank is intrusted, and what function of the bank may they not discharge? I need not pursue this subject, however, for the defendants do not stand upon Kennedy's authority as president, but upon an alleged delegation of authority, as set out in the offer. An intelligent discussion of the subject requires a clear understanding of what is proposed as evidence of such delegation. The terms of the offer in this respect are that "in the actual management of the business of the Spring Garden National Bank, the president was the sole managing officer; that the cashier occupied the position more of clerk than of actual cashier." What is the proper signification of this language? I am not clear that it amounts to more than an offer to prove that Kennedy discharged the duties of cashier as well as those of president. If more was intended why were the words "that the cashier occupied the position more of clerk than cashier," inserted? Any other interpretation than that suggested requires the exclusion of this language as immaterial. Apparently it was introduced to qualify or illustrate the preceeding terms "sole managing officer of the bank." That the defendants so understood the offer seems to be shown by their assignment of error, in this respect, which is as follows: "Because the learned judge overruled the offer of defendants to show that the president was the executive officer of the bank." In this view of the offer it clearly does not embrace what is necessary to prove the alleged delegation of authority to represent the bank in this transaction. But in any possible interpretation of the language it is no more than an offer to prove that he was the "sole managing officer of the bank" in the transaction of its ordinary and legitimate

business; that is, to prove that the directors expressly or impliedly conferred such authority upon him. There is no pretense of an express delegation; no by-law, order, or minute of the bank on the subject is suggested. The allegation is that the directors acquiesced in his exercise of the authority, and thus justified an implication that it had been delegated. There can be no doubt that the board of directors may delegate its authority; the statute so provides; nor is there any room for doubt that such delegation may be implied from its acts; as where it has acquiesced in the exercise of its authority by others. If, therefore, it were shown that the directors of the Spring Garden National Bank acquiesced in the president's "sole management of its business," it might be inferred that they had authorized him to so manage. But it nowhere appears that the borrowing of commercial paper, especially for the purpose avowed here, is any part of the usual, or unusual, business of national banks. The court certainly has no knowledge that it is; and I do not believe it is. In this view the implied authority alleged, would not embrace this transaction, even if the bank itself might lawfully have entered into it. In my judgment, however, the bank could not have lawfully entered into it; and in this view it is, of course, clear that no authority in Kennedy to do it, could be implied from his "sole management of the bank's business." The implied authority could not possibly extend, in any construction of the offer, beyond the lawful business of the bank. Thus we are brought to the question: Is the borrowing of commercial paper, for the purpose here avowed, embraced within the legitimate business of national banks? In my judgment, as before suggested, it is not. Not only is no warrant for it, express or implied, found in the statute, but on the contrary the scheme there provided for the protection of stockholders, creditors and the public, in my judgment, forbids it. Its direct purpose and effect is deception. The inflation of assets, and the creation of fictitious credit. The allegation in this instance that the paper was desired to supply the place of smaller and less desirable notes on hand, is unimportant. It was avowedly wanted because "it would look better for the bank to have a large note, of a responsible firm, like Simons, Bro. & Co.,"—in other words it would enable the bank to conceal its exact situation, and give it a credit which it did not deserve. If the purpose had been to create a better appearance before the bank examiner the impropriety would have been little greater.

There are many apparently harmless things which national banks may not do. They may not deal in lands, or stocks, or commercial paper, except in the manner and for the purposes authorized by the statutes, act as brokers, nor enter upon any other business or transactions foreign to the object of their creation. First Nat. Bank v. National Exchange Bank, 92 U. S. 122; Bank v. Hoch, 89 Pa. St. 324; Weckler v. Bank, 42 Md. 581; Bank v. Johnson, 104 U. S. 271; Danforth v. Bank, 48 Fed. Rep. 271, 1 C. C. A. 62. I do not propose to remark upon the authorities cited by counsel on either side, bearing on this question, except to the ex-

tent they are relied upon by the court. Merchants' Bank v. State Bank, 10 Wall. 604; Coats v. Donnell, 94 N. Y. 168; Bank v. Armstrong, 50 Fed. Rep. 798; and Morse, Banks, § 160,—are cited by the court on this subject. In the first of these cases the defendant's cashier purchased gold coin of the plaintiff, paying for it with the check of Mellon, Ward & Co. What the case decides is embraced in the two following propositions, stated by the court:

"First. If the gold actually went into the bank, as was admitted by the cashier, the bank was liable as for money had and received, whatever might have been the defect in the cashier's authority, to make the purchase. Second. It should have been left to the jury to determine whether, from the evidence (if the gold did not go into the bank) as to the powers exercised by the cashier with knowledge and acquiescence of the directors, and of the usage of other banks in the same city, it might not fairly be inferred that the cashier had authority to bind the bank by the contract which he made for the coin."

These statements fully cover all the case decides. The judge delivering the opinion, however, uses certain general expressions, considered important, among which are the following:

"Where a party deals with a corporation in good faith—the transaction is not ultra vires—and he is unaware of any defect of authority or irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect of authority, the corporation is bound by the contract, although such defect or irregularity in fact exists."

It is no doubt my fault, or misfortune, that I cannot understand precisely what this language is intended to express. Of course it is to be read in connection with the facts of the case; but when the facts are considered it does not seem to have any very close relation to them. It surely was not intended to be understood as asserting that one who deals, in good faith, with the agent of a corporation, clearly outside the limits of the ordinary authority of such agents, can hold the corporation, (in the absence of fault on its part,) responsible for such unauthorized act. The acts of an agent bind his principal within the scope of his authority, express and implied; but no further, unless the principal is in fault, or has ratified the unauthorized act. The books contain numerous cases which illustrate this statement. No more striking example is found than that of The Freeman, 18 How. 187, in which it is held that the authority of a master to sign bills of lading does not render the vessel, or his employers, liable to a third person to whom such a bill, which he had signed without receiving the goods, had been transferred. His power extended only to signing for goods received; within this limit it was plenary. His position gave him credit, and made the perpetration of fraud easy. And yet his principals could not be held responsible for his unauthorized act, to one defrauded by it. If the law was otherwise, no sensible person would employ an agent. In passing from the case of Merchants' Bank v. State Bank, it may be remarked that no question of ultra vires was involved; the banks have express authority to buy coin; and also that while no more was involved than I have stated, the court was seriously divided over the result.

Coats **v.** Donnell, the second case above referred to, decides simply that a bank, after enjoying the benefit of a transaction, entered into by its cashier in its name—which in that case was, substantially, the borrowing of money from brokers, (through drafts which the latter accepted,) could not object to the brokers' retaining the bank's funds (in their hands) in payment of balances due, and liabilities assumed. There the by-laws expressly empowered the cashier to attend to all the active business of the bank, *   *   * exercising his own judgment as to all matters," etc. The court points to the fact that the cashier's object was to obtain money to carry on the bank's business, and that it got the fruits of the transaction. What is said about the cashier's authority by virtue of his office, is aside of the case, and unimportant.

Bank v. Armstrong, the last of these cases, is almost identical with Coates v. Donnell; in principle it is quite so. The vice president of the bank, who had charge of its general business, used its securities to borrow money in the name, and ostensibly for the use, of the bank. The money was placed to the credit of the bank, and directly after applied to the vice president's use. Having lawful possession of the securities he could undoubtedly negotiate them; and the bank would be defenseless against his innocent indorsee. His fraud affected the bank alone, who intrusted him with its securities and business. There does not appear to have been any contest whatever over this question. The court dismissed it in a dozen lines, without citing any authority. The controversy was about another matter. Here again the general expressions of the court were unnecessary, and must be confined to the facts before it.

The citation from Morse, Banks, § 160, is principally, if not entirely, founded on general observations contained in the cases just noted, and signifies nothing more than they decide. An examination of all the cases I have found in which the exercise by the president or cashier of other than the ordinary authority of executive officers has been sustained, shows that it was because of power delegated by the directors, either expressly or impliedly; and, also, because, almost uniformly, the bank received the fruits of the transaction.

Now I trust I may not be misunderstood. Of course the question of ultra vires would be wholly unimportant if the bank itself had directly entered into the transaction, or had authorized Kennedy to do so. It could not, in such case, take advantage of its own wrong, and enforce the note. As before stated there is no pretense that the bank itself directly entered into it. The allegation is that Kennedy did so as its agent—not expressly but impliedly authorized. What I mean to assert, therefore, is that no agency to perform this act can be implied from the evidence proposed by the defendants' offer, even in its broadest possible construction,—evidence that Kennedy "was the sole managing officer of the bank." If upon a retrial the evidence shall go so

materially beyond the offer as to show that Kennedy had previously entered upon such transactions, or that he had entered upon this particular transaction with the bank's knowledge, or under circumstances from which such knowledge can properly be inferred, then in my judgment a valid defense will be established; but not otherwise—unless, of course it shall then appear that the bank did not receive the note in good faith, for value. I have assumed that the defendants were faultless in executing the note. Whether the purpose avowed by Kennedy should not have warned them against executing it, has not been considered.