### GROW *v.* COCKRILL.

Opinion delivered February 6, 1897.

NATIONAL BANK—AUTHORITY.—A national bank is not authorized to act as a broker in lending the money of others.

Appeal from Pulaski Circuit Court.

ROBERT J. LEA, Judge.

#### STATEMENT BY THE COURT.

The appellant, Jennie Grow, had a credit in the First National Bank of Little Rock, in February, 1892, and on the 15th of that month wrote to H. G. Allis, then president of that bank, addressing him in his individual capacity, however, and made inquiry of him as to how much the bank would pay as interest for the loan of her money, or language to that effect. This letter seems to have been answered on the 24th by W. C. Denny, who was then cashier, and he informed her, among other things, "that the bank would pay four per cent. interest on deposits, giving their (the bank's) certificate for the same, which is not subject to check. If the certificate is cashed before the expiration of the time mentioned—six months—the interest is forfeited. I can give you a very secure loan for $800 for a year, secured by stock of this bank at par, interest payable semi-annually. If you care to avail yourself of this loan, let me hear from you."

On May 2d appellant wrote again, asking if the loan could still be made as stated in Denny's letter of February 24th, and quoted last above; also as to the rate of interest she could get, and also saying she had about $900, including the amount in bank, then amounting to $500.

Denny answered this letter on the 5th of May, saying: "Replying to your favor of the 2d inst., have to say, if you will send us enough to make $1,000, we can get you a loan for one year at 9 per cent., secured by the stock of this bank, interest payable semi-annually."

On May 16, 1892, appellant wrote, saying: "I send in to-day's mail check to Mrs. Kimbrough, who will hand you five hundred dollars, and take the five hundred dollars I now have in your bank, making one thousand dollars, and loan out and give the note the party gives you loaned it to, to Mrs. Kimbrough, * * * *. Please let me hear from you." P. S. "You wrote your bank would secure the loan." Signed. "J. Grow."

This letter was answered by Denny on the 21st May, saying: "I have your favor of the 16th inst., stating that Mrs. Kimbrough would deposit $500 with us, making your balance $1,000, which you desired us to lend for you. It seems that you are mistaken about the bank securing the loan. I believe I stated that I could get you a loan for $1,000, secured by the stock of this bank at par, which is good security. We would not lend your money, unless we knew it was perfectly safe. I can assure you you need have no fear on that point. The $500 has not yet been delivered; but as soon as we have it on hand, we will make the loan, and notify you, and deliver Mrs. Kimbrough the note."

This correspondence is given in full, in order to show the exact nature of the transaction between the appellant and these bank officials, as well as the relation of the parties to the loan, which was on the 2d of

June, 1892, made in accordance with the tenor of this correspondence.

The appellant, during the period of this correspondence, was residing in Caldwell, Kansas, and wrote her letters from that place. It seems that she subsequently moved to Washington City. The Mrs. Kimbrough was an aunt of appellant, residing in Little Rock, and the " Cousin Clif. " mentioned subsequently in testimony and letter was T. C. Powell, then residing in Little Rock, a good business man, and one well acquainted with such business as he was called upon to transact by and for appellant. He has since died.

Mrs. Kimbrough testified that appellant, from Washington City, in May, 1892, wrote to her as follows, to wit: "I enclose drafts for $500. I have $500 in the First National Bank. Take these there to be cashed. * * * I wrote them [the bank people] you will hand them $500, and to give you the note from the party they loan it to. Tell Cousin Clifton all about it. It is $1,000 they are to loan out, including the $500 I have in bank." Witness, proceeding further, stated: "I got my nephew, Clifton Powell, an insurance man, to help me, and go with me to the bank when I deposited the $500. It was not fixed that day, as they said the man they were going to loan it to was out of town. I had no more to do with it. Mr. Powell is dead. The note and collateral were delivered to him, and he sent them to my niece (appellant). Mr. Powell is the 'Cousin Clif.' mentioned in the letter, and he went with me to see the matter was arranged according to plaintiff's letter."

G. R. Brown testified, in substance, that on June 2, 1892, Denny brought the note in suit to him to sign, saying that Mrs. Grow had some money in bank which Allis wanted to borrow, and he (Allis) desired me to make the note for it. Witness answered, "All right, if he will put up the security." He did not own the stock,.

never got the money, and never knew anything more about it. He said the bank failed in February, 1893, and, previous to that event, he had signed accommodation paper for Allis amounting to several hundred thousand dollars. Witness stated that when he made the note in suit on the 2d June, 1892, he was the owner of $25,000 worth of property, but that when the bank failed in February following, Allis failed, and that made him (witness) insolvent.

The testimony of Clement H. Yost, a former book keeper of the bank, shows that on 2d June, 1892, appellant had to her credit in the bank $1,000, and that on that day Allis' account was credited with $1,000; that Allis' account, at that time, was overdrawn to the amount of $23,249 ; that he had no way of telling from the books why Mrs. Grow was debited with $1,000, or why Allis was credited with $1,000, on that day; that the certificate of stock was genuine, and that it was shown upon the books that it belonged to Allis, and that he purchased the same from Roots, and that Allis' irregular transactions wrecked the bank.

Nick Kupferle testified as to the market value of the bank stock on June 2, 1892, and until October following; as to Allis' misconduct in the management of the bank, and the ignorance of the same on the part of the directors, of whom he was one.

The affairs of the bank, after its failure, were placed in the hands of appellee, as receiver, and he is sued in this action as such. Judgment for defendant, and plaintiff appealed to this court.

*Dan W. Jones & McCain* for appellant.

The answer constituted no defense. Bank officials, having undertaken to lend money for depositors, cannot become borrowers, or interested with the borrower. 26

Ark. 445; 16 *id.* 345; Mechem, Agency, secs. 66, 67.
The entire correspondence shows that the bank officials
acted as officials, and not as *individuals*. Boone, Bank-
ing, secs. 110, 115; 5 Wheat. 326.

S. R. *Cockrill* and *Ashley Cockrill* for appellee.

The action *ex contractu* is not sustained by any
proof, and fails. The president and cashier have no
power to bind the bank, except in the discharge of their
ordinary duties, and the bank is not liable for their
torts. A national bank has no power to act as broker.
6 Pet. 51; Boone, Banking, secs. 119, 353; *ib.* 682, 101;
152 U. S. 346; 42 Md. 581; 89 Pa. St. 324; 92 U. S. 122;
42 N. E. Rep. 567; 28 S. W. Rep. 303; Cooley, Torts,
119; 65 Fed. Rep. 932; 77 *id.* 129; L. R. 9 Q. B. 301.

BUNN, C. J., (after stating the facts.) The com-
plaint, in brief, charges that the bank and its president,
contemplating insolvency, and desiring to keep plain-
tiff's money from being checked out of the bank by her,
combined with its cashier, and entered into a conspiracy
to deceive her, and to induce her to allow her money to
remain in the bank, to be used by its president; and to
accomplish this scheme the cashier, with the connivance
of the president of the bank, wrote to appellant, at
Washington, D. C., proposing to lend out her money on
good security, and, she assenting to this arrangement,
these bank officials induced Brown to execute the note
to her for the $1,000, and assign the stock certificate to
her as collateral security to the note, they pretending
to her that the bank had loaned her money to Brown,
that he was solvent, and that he owned the bank stock,
and that the same was good security; with many speci-
fications thereunder.

Brown and the receiver each filed a separate answer,
specifically denying each allegation and charge affecting
him and the bank respectively.

None of the material allegations of the complaint controverted by the separate answer are sustained by the evidence (the whole of which we have substantially set forth in our statement of facts); nor does it appear from the testimony that the bank officials conspired together to deceive appellant as charged, for in the correspondence between them she seems to have taken the initiative, and their letters appear as letters usually do in such cases. The loan, as it was finally made, viewed in the light of subsequent events, may and doubtless does give rise to inference as to motives actuating the parties from the beginning. But that is all, and that is scarcely sufficient to base a judgment upon. Moreover, appellant having given authority to these people to take her money from the bank, and pay it over to the borrower, whoever he might be, it does not appear just how she, alone, can complain of the mere manner in which her account was balanced upon the books, or because Brown, the borrower, chose to let Allis use the money, or have the same credited to his account. The loan itself seems to be all that may be questioned, and this Powell, the confidential agent and relative, seems to have regarded as proper, although he himself might have been deceived. On the coming in of the testimony, Brown was let out of the case by the plaintiff, and the court sitting by consent as a jury, found for the receiver; whether on the law, or facts, or both, does not appear, as there were no special findings, but presumably on both, judging from the grounds of the motion for new trial.

After all, the facts still remain that within about six months next after the loan was made, the bank was wrecked by the misconduct of its president, and its stock (including the collateral stock held by the plaintiff) was rendered worthless. Brown was made insolvent, and it appears that appellant must lose her entire

debt, unless, in this proceeding, she can show the bank is liable for the tortious acts of its officials in dealing with her, if they were guilty of such at all; and, of course, this liability of the bank, if any exists, grows out of the relation it had with its president and cashier, and the connection it had constructively, through them, with the transaction with appellant; and this is the only proposition we have to consider.

We do not regard the plaintiff as suing on the note from Brown, or as seeking to make the stock available, for it does not appear that the note is declared on in the complaint as evidencing a cause of action *ex contractu*, but the note and certificate of stock seem only to be a part of the history of the transaction of the bank officials and plaintiff. The case is therefore relieved of the imputation that it rests on inconsistent causes of action. We think it rests solely on the principle that one is civilly bound for the tortious acts of his agent, committed within the scope of his business and authority. The general rule is, "the principal is liable for the wrongful, fraudulent, or deceitful act of the agent committed within the scope of his authority," but "we must distinguish between the authority to commit a fraudulent act, and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal, neither negligence nor fraud is within the scope of the agency; but, tested by the connection of the act with the property and business of the agency, fraud in taking the very property is as much within the scope of the agency as negligence in allowing the others to take it. The proper inquiry is whether the act was done in the course of the agency, and by virtue of the authority of the agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent." Mechem, Agency, sec. 739. The line

between the tortious acts of the agent when committed within the scope of his authority as such agent, and those when committed without the scope of his agency, as those acts may or may not affect the principal, is rather sharply and forcibly drawn in the case of *Foster* v. *Essex Bank*, 17 Mass. 479.

Again, it must not be lost sight of that, while the principal is responsible for the tortious acts of his agent committed while in the exercise of his authority as such, yet the principal is subject to another principle, and that is, the acts of the agent must be such as the principal has a right to require of him, or he will not be liable by operation of law, unless he has made himself actually liable otherwise.

The services the cashier undertook to render for the appellant seem to have been a mere gratuity—done as an accommodation to her—if not deceptively. There is no showing that the bank, by its charter, had authority to transact such business as that of loaning the money of its depositors or other people in general. Such authority we have failed to find in the national banking law, and the decisions on the subject, or rather the decisions involving analogous facts, all seem to be to the effect that the business of a broker (and a broker's business is to loan the money of others, or borrow for others, and such like) is not a business in which a national bank can lawfully engage, since it is not mentioned in the national bank act, and the act is strictly construed as against the grantee corporation, as to powers conferred as in all cases of private corporate grants of power.

In the case *Weckler* v. *First National Bank of Hagerstown,* 42 Md. 581, suit was brought against the bank for damages growing out of the purchase of certain bonds, which the teller of the bank had sold him, and falsely represented to be what they really were not,

to the injury of plaintiff, the complaint averring that the bank was engaged in buying and selling these bonds, and was therefore liable for damages occasioned by the false representation, in relation thereto, of the teller, one of the agents in the transaction of its business. The plaintiff was defeated in his suit, the court holding that the bank had no authority to transact that kind of business, and the teller was therefore not acting within the scope of his authority and business when he committed the torts complained of. To the same effect is the ruling in the case of *First National Bank* v. *Hoch*, 89 Pa. St. 324, and that in the case of *Dresser* v. *Traders' National Bank*, 42 N. E. 567.

We have been unable to find a case exactly on all fours with the case at bar as to the subject-matter of the transaction, a case where the bank officials were engaged in making loans for other people to third parties, and gratuitously; but, involving acts of the same class, the cases are quite numerous.

The case really is between appellant on the one hand and the stockholders (if they really have any interest left in it) and other creditors. We are unable to find any ground upon which we would reverse the judgment, and the same is therefore affirmed.

BATTLE, J., did not participate in the decision of this case.